**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION - DETROIT**

**IN THE MATTER OF:**

Offshore Spars Co., et al.[1]

           Debtors.

Case No. 23-44657
Judge Thomas J. Tucker
Chapter 11
Jointly Administered

**DEBTOR'S MOTION FOR ENTRY OF AN ORDER (I) APPROVING THE SALE OF ASSETS TO OFFSHORE ACQUISITION, LLC FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES, (II) APPROVING THE ASSET PURCHASE AGREEMENT, (III) TERMINATING ASSET PURCHASE AGREEMENT WITH RIGPRO, LLC (IV), AUTHORIZING ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION WITH THE SALE; AND (V) GRANTING RELATED RELIEF**

Offshore Spars Co. (the "Debtor"), by and through its undersigned counsel, hereby submits this motion (the "Motion") pursuant to, *inter alia*, sections 105 and 363 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (as amended, the "Bankruptcy Code"), and rules 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (each a "Bankruptcy Rule," and, collectively, the "Bankruptcy Rules") and rules 6004-1 and 9014-1 of the Local Rules of the United States Bankruptcy Court for the Eastern District of Michigan (each a "Local Rule," and, collectively, the "Local Rules"), for the entry of the order (the "Sale Order"),

---

[1] The Debtors in these jointly administered cases are Offshore Spars Co. (Case No. 23-44657) and Eric G. Graczyk (Case No. 23-44658).

1

substantially in the form attached hereto as **Exhibit 1**, approving the Debtor's

proposed sale (the "Sale") of substantially all of its assets (collectively, the "Assets")

free and clear of all liens, claims, encumbrances and interests (other than Assumed

Liabilities), including rights or claims based on any successor or transferee liability;

as provided therein; pursuant to the terms of that certain asset purchase agreement

(including all exhibits, schedules, and ancillary agreements related thereto, and as

may be amended and in effect, the "APA") by and among the Debtor and Offshore

Acquisition, LLC (the "Buyer"), dated as of November 2, 2023, a copy of which is

attached hereto as **Exhibit 6A**.[2]  In support of the Motion, the Debtor respectfully

represents as follows:

<u>**Jurisdiction and Venue**</u>

1.      This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§

157 and 1334.

2.      This matter is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2).

3.      Venue of this proceeding and this Motion is proper in this judicial

district pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The statutory predicates for the relief sought herein are, *inter alia*,

sections 105, 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 6004, and

---

[2]      Capitalized terms used but not defined herein shall have the meanings
ascribed to them in the APA.

9014, and Local Rules 6004-1 and 9014-1.

## **Background**

5.     On May 23, 2023 (the "Petition Date") the Debtor filed a voluntary petition in this Court for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code").

6.     The Debtor continues to manage and operate its business as debtor-in-possession pursuant to § 1184 of the Bankruptcy Code.

7.     Eric R. Graczyk is the responsible person for the Debtor.

8.     Deborah Fish has been appointed Subchapter V Trustee in above-captioned jointly administered cases.

9.     The Debtor was established in 1976 and its primary business is designing and manufacturing carbon fiber and composite masts and booms for the global superyacht market.  The Debtor has additional lines of business including replacement and service of standing and running rigging for yachts, e-commerce, and carbon fiber manufacturing for other industries, including the aerospace and automotive industries.

10.     In January 2022, the Debtor was acquired by Graczyk Holdings, LLC, a Michigan limited liability company whose sole member is Eric Graczyk.  Not until after the purchase of the Debtor did Mr. Graczyk discover numerous financial inconsistencies, warranty claims, and general operational issues that had befallen the

3

Debtor under previous ownership.  Though Mr. Graczyk spent considerable time and effort prior the Petition Date attempting to remedy such matters, a rehabilitation of the business through a Subchapter V bankruptcy became necessary.

11.     Notwithstanding the Debtor's best efforts, profitability has been a material concern during the bankruptcy process as customer demands, market conditions, and creditor pressure have caused issues to the daily operations and financial well-being of the Debtor.

12.     The Debtor has determined, in the exercise of its business judgment, that the best way to maximize the value of its assets is to sell such assets through the Sale pursuant to section 363 of the Bankruptcy Code.  To this end, the Debtor has executed the APA with the Buyer to provide for the sale of the Assets to the Buyer for two million four hundred thirty thousand ($2,430,000.00) dollars, less the Cash on Hand (as defined in the APA).

13.     The Sale of the Assets will serve to maximize the value to the bankruptcy estate, relieve the estate of substantial obligations relating to such assets, ensure a pathway to a confirmable plan and avoid the further deterioration in the value of the Assets.

14.     The Debtor operates in a unique and limited marketspace with a very limited pool of potential purchasers.  The Debtor and its professionals have been promoting the Assets to the marketplace in this specialized industry and believe the

4

Debtor has obtained the highest and best price for the Assets. Moreover, any delay in approval of the proposed sale will place the sale at risk which would be damaging to Debtors and their creditors.

15.    Indeed, the proposed sale contemplates a purchase price sufficient to satisfy all undisputed secured claims, administrative claims, and priority claims of the Debtor's bankruptcy estate, while, at the same time, ensuring a distribution to unsecured creditors that is no less than the proposed distribution in the Plan of Reorganization of Offshore Spars Co. and Eric R. Graczyk. The material benefit to all parties includes the removal of any uncertainty of the Debtor's continued operations and prompt payment in an amount that was already met with near universal support by the creditor base.

16.    The Debtors have no relationship with the Buyer and the proposed sale is the product of extensive arms-length negotiation between the parties. The Buyer is seeking to retain Graczyk as an employee. The material aspects of the APA; however, including the purchase price for the Assets was negotiated prior to terms of Graczyk. The terms of Graczyk's employment are attached as an exhibit to the APA and provides the basis for confirming a feasible plan of reorganization in Graczyk's individual bankruptcy case and thus is in the best interest of both Debtors.

17.    The Debtors believe that pursuing the Sale is the course of action most likely to maximize the value of the Assets. As a result, and in an exercise of their

5

fiduciary obligations to their respective estates, and in exercising appropriate business judgment, Debtor has executed the APA and seeks authority of this Court to approve the same via this Motion.

18.     Further justification for the relief requested herein is set forth in the Declaration of Eric R. Graczyk filed contemporaneously herewith.

## **Relief Requested**

19.     By this Motion, the Debtors respectfully request that the Court enter an order approving the Sale of the Assets free and clear of all liens, Claims, encumbrances and interests (with such liens, claims, encumbrances and interests attaching to the sale proceeds) and granting certain related relief substantially in the form submitted.

## I. **The Proposed Sale of the Assets**

### a. **The APA**

20.     The following is a summary of the principal terms of the APA:[3]

   a.   <u>Purchase Price:</u> Under section 2.5(a) of the APA, the aggregate consideration (the "<u>Purchase Price</u>") for the purchase, sale, assignment, and conveyance of the Assets consists of: (i) cash (the "<u>Cash Consideration</u>") in an amount equal to $2,430,000.00, less the Cash on Hand.

---

[3]     The following summary is qualified in its entirety by reference to the provisions of the APA. In the event of any inconsistencies between the provisions of the APA and the terms herein, the terms of the APA shall govern.

b. <u>Assets:</u> Section 2.1 of the APA provides that the Buyer shall purchase substantially all of the Debtor's assets, as defined as the Purchased Assets therein.

c. <u>Assumed Liabilities:</u> Section 2.3 of the APA provides that the Buyer will not assume or perform any liabilities of the Debtor other than those set forth therein.

d. <u>Closing.</u> Pursuant to Section 2.6 of the APA, the closing shall take place on the occurrence of the latest of the following: (i) the fifth business day after entry of the Sale Order; (ii) Buyer receiving Acceptable Environmental Reports, and (iii) January 12, 2024.

e. <u>Closing Conditions</u>. Pursuant to Section 6.2 of the APA, the closing is conditioned upon, *inter alia*, the Bankruptcy Court shall have entered the Sale Order and it shall not be subject to a stay pending appeal; Buyer shall have received Acceptable Environmental Reports; the Buyer shall be satisfied in its sole discretion with its legal, financial, accounting, product, operations, environmental, and other diligence of Seller, the Company, the Business, and the Purchased Assets; and the landlord of the Debtor's facility having executed an amended and modified lease acceptable to Buyer in its sole discretion (the "<u>Modified Lease</u>") and entry of an order by the Bankruptcy Court acceptable to the Buyer in its sole discretion (which provisions may be included in the Sale Order) authorizing and approving the assumption and assignment of the Modified Lease and establishing the cure amount not to exceed $27,500.00.

**b. Assumption and Assignment of the Executory Contracts and Unexpired Leases**

16. Contemporaneously with the filing of this Motion, the Debtor will file with this Court and serve the Cure Notice on each counterparty to an executory contract or unexpired lease related to the Assets, substantially in the form attached

7

as **Exhibit 6B** to the Motion, which Cure Notice shall: (i) state the amounts necessary to cure defaults, if any, that the Debtor believes are necessary to assume such contracts or leases in accordance with section 365 of the Bankruptcy Code (the "Cure Amount"); (ii) notify the non-Debtor counterparty that such party's contract(s) or lease(s) may be assumed and assigned to the Buyer; and (iii) state the deadline by which the non-Debtor counterparty may file an objection to the Cure Amount(s) or to the assumption and assignment of the applicable contract(s) and/or lease(s); provided, however, that the inclusion of a contract, lease or agreement on the Cure Notice shall not constitute an admission that such contract, lease or agreement is an executory contract or unexpired lease or that it will, in fact, be assumed and assigned in connection with the Sale of the Assets.

17.     It is noted by the Debtor that in this particular case, other than with respect to the Modified Lease which relates to the Facility at which Debtor operates, the only other contracts Buyer has identified as being potentially assumed executory contracts are with respect to orders placed by Debtor's customers. As such, except for the Modified Lease, Debtor believes that no amounts to cure defaults exist and as such there will be a "zero" Cure Amount for all contracts identified on the Cure Notice. The Debtor reserves all of its rights, claims, and causes of action with respect to the contracts, leases, and agreements listed on the Cure Notice.

18.     The APA provides that, as one of Buyer's conditions to Closing, entry

of an order by the Bankruptcy Court acceptable to the Buyer in its sole discretion (which provisions may be included in the Sale Order) authorizing and approving the assumption and assignment of the Modified Lease and establishes the Cure Amount to be paid by Buyer not to exceed $27,500.00.

19.     The Debtor proposes that any objection to the Cure Amount or the assumption and assignment of the applicable contract(s) and/or lease(s) must be filed with the Clerk of the Court, 211 W. Fort St., Detroit, Michigan 48226, and served so as to be received by:  (a) counsel to the Debtor, Stevenson & Bullock, PLC, Attn: Elliot Crowder, 26100 American Drive, Suite 500, Southfield, MI 48034; (b) counsel to the Buyer, Dykema Gossett PLLC, Attn: Sheryl L. Toby, 39577 Woodward Avenue, Suite 300 Bloomfield Hills, Michigan 48304; (c) the Subchapter V Trustee, Deborah L. Fish, 211 West Fort Street, Suite 705, Detroit, MI 48226; and (d) counsel to Pathward N.A. ("Pathward"), Taft Stettinius & Hollister LLP, Attn: Kimberly R. Clayson, 27777 Franklin Road, Suite 2500, Southfield, MI 48034 (collectively, the "Consultation Parties"), on or before November 27, 2023  (the "Cure Objection Deadline").  Any such objection must also state (i) the basis for such objection and (ii) with specificity what Cure Amount(s) the non-Debtor counterparty to the relevant executory contract(s) or unexpired lease(s) believes is required (in all cases with appropriate documentation in support thereof).

20.     Any objection solely to the Cure Amount(s) may not prevent or delay the Debtor's assumption and assignment of assumed and assigned contract(s) or lease(s).  If an entity objects solely to Cure Amount(s), the Debtor may, with the consent of the Buyer, hold the claimed Cure Amount(s) in reserve pending further order of the Court or mutual agreement of the parties. So long as the Cure Amount(s) are held in reserve, and there are no other unresolved objections to assumption and assignment of the applicable assumed and assigned contract(s) or lease(s), the Debtor can, without further delay, assume and assign such contract(s) or lease(s).  Under such circumstances, the objecting non-Debtor counterparty's recourse is limited to the funds held in reserve.

21.     If no objection to the Cure Amount(s) is timely received, the Cure Amount(s) set forth in the Cure Notice shall be controlling notwithstanding anything to the contrary in any Purchased Contracts or other document(s) as of the date of the Cure Notice.

22.     To the extent that any non-Debtor counterparty does not timely file and serve an objection as set forth above herein, such counterparty will be:  (i) deemed to have consented to the Cure Amount(s), if any, set forth in the Cure Notice; (ii) barred, estopped, and enjoined from asserting any additional Cure Amount(s) under the assumed and assigned executory contract(s) or unexpired lease(s); (iii) barred from objecting to the assumption and assignment of the applicable assumed and

assigned executory contract(s) or unexpired lease(s) to the Buyer; and (iv) barred from objecting to adequate assurance of future performance by the assignee.

### c. Termination of the Asset Purchase Agreement with Rigpro, LLC

23.     In the Debtor's Plan of Reorganization of Offshore Spars Co. and Eric R. Graczyk [Docket No. 93] (the "First Plan"), the Debtor proposed to sell its autoclave, tooling, and mast spinners to Rigpro, LLC ("Rigpro") pursuant to the terms of an asset purchase agreement attached to the First Plan as Exhibit C (the "Rigpro APA").

24.     Importantly, the sale contemplated in the Rigpro APA was expressly conditioned upon Court approval of the Rigpro APA and the First Plan.

25.      Debtor, in its business judgement, has determined that pursuing this Court's approval of the Rigpro APA is not in the best interest of the Debtors estates and through this Motion, the Debtor seeks confirmation by this Court that the Rigpro APA is terminated without any further duty or obligation of any kind or nature by the Debtors.  Cause exists for termination of the Rigpro APA which includes: (i) the APA with the Buyer is for substantially more than the Rigpro APA; and (ii) after the filing of the First Plan, the Debtor was informed by Pathward that the proposed surcharge of the Pathward collateral (the assets contemplated to be sold under the Rigpro APA) was objectionable and; (iii)   approval of the Sale provides an avenue for an immediate distribution to creditors under a plan of liquidation of Offshore

11

Spars Co. rather than payments over time as presently contemplated under the First Plan.

## II. Grounds for Approval of the Motion

26. In accordance with Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary course of business may be by private sale.

27. Compelling business justifications exist for the proposed Sale. First, the Debtor does not have sufficient liquidity or access to financing to fund a protracted and contentious chapter 11 case. As a result, and cognizant of its current monthly cash outlay, continued use of cash collateral, and its fiduciary obligations, the Debtor believes that a sale of substantially all of its assets offers the best available alternative at this juncture. Moreover, the Debtor believes that the proposed sale set forth herein will satisfy the secured, administrative, and priority obligations of the bankruptcy estate. Plainly stated, this is a substantial and material recovery for the bankruptcy estate and a testament to the Debtor's commitment to the bankruptcy estate. Accordingly, the Debtor has determined that it should pursue the Sale of the Assets to the Buyer on the terms set forth in the APA.

28. Moreover, the Debtor's principle desires to ensure that the bankruptcy estate is maximized, employees remain employed and able to support their families, and customers continue to receive service.

12

29.     The sale of the Debtor's Assets provides considerable value to the bankruptcy estate as it will satisfy, in full, the secured, administrative, and priority claims of the Debtor's bankruptcy estate and a distribution to unsecured creditors.  It similarly provides the basis for confirming a feasible plan of reorganization in Graczyk's individual bankruptcy case and thus is in the best interest of both Debtors. It is also noteworthy that the proposed sale is a going-concern sale, which contemplates the continued employment of Debtor's employees.

30.     The Sale of the Assets pursuant to section 363 of the Bankruptcy Code will enable the expeditious transfer of such assets, an approach necessary to maximize and preserve the going-concern value of such assets.

31.     Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

32.     In approving the sale of assets outside the ordinary course of business and outside of a chapter 11 plan pursuant to section 363 of the Bankruptcy Code, courts, including those in the Sixth Circuit, have adopted the "sound business reason" test established by the Second Circuit in *Committee of Equity Security Holders v.*

13

*Lionel Corporation (In re Lionel Corp.),* 722 F.2d 1063 (2nd Cir. 1983). See, *Stephens Indus., Inc. v. McClung,* 789 F.2d 386, 391 (6th Cir. 1986); *In re Nicole Energy Servs., Inc.,* 385 B.R. 201, 230 (Bankr. S.D. Ohio 2008); *In re Jillian's Entm't Holdings,* 327 B.R. 616, 617 (Bankr. W.D. Ky. 2005) (stating that the *Lionel* standard has been adopted by the vast majority of courts); see also, *In re Del. & Hudson Ry. Co.,* 124 B.R. 169, 176 (Bankr. D. Del. 1991) (holding that transactions should be approved under section 363(b)(1) when: (a) they are supported by the sound business judgment of a debtor's management; (b) interested parties are provided with adequate and reasonable notice; (c) the sale price is fair and reasonable; and (d) the Buyer is acting in good faith.

33.     A debtor's showing of sound business justification need not be unduly exhaustive; instead the debtor or trustee is "simply required to justify the proposed disposition with sound business reasons." *In re Baldwin United Corp.,* 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984). Whether or not there are sufficient business reasons to justify a sale depends upon the facts and circumstances of each case.  See, *Lionel*, 722 F.2d at 1071. Bankruptcy courts are given substantial discretion in deciding whether to authorize a sale of a debtor's assets outside of the ordinary course of business. *See In re Chateaugay Corp.,* 973 F.2d 141, 144 (2d Cir. 1992).

34.     As discussed above and in the Declaration, the Debtor and its management have concluded after due deliberation that, in light of the distressed

14

nature of the Debtor's business, the Sale of the Assets represents the best alternative currently available and satisfies the "sound business purpose" test for the sale of assets outside the ordinary course of business under section 363(b) of the Bankruptcy Code.

35.     Moreover, the Debtor has worked collaboratively with the Subchapter V Trustee, Pathward, and the Office of the United States Trustee during the pendency of its case and regarding the proposed sale and has kept constituents apprised of its sale efforts.  .

36.     In addition to a fair and reasonable value offered by the Buyer for the Assets, the APA is the product of arms' length, good faith negotiations between the relevant parties.  Finally, adequate and reasonable notice of the sale process is being provided, in accordance with applicable rule.

37.     Accordingly, the Debtor submits that the Sale of the Assets as contemplated herein is in the best interests of the Debtor, its estate and creditors, and should be approved.

a. **The Assets Should Be Sold Free and Clear of Claims, Liens, Encumbrances and Interests Under Section 363(f) of the Bankruptcy Code**

38.     The Debtor also submits that the Sale of the Assets should be free and clear of any and all liens, Claims, encumbrances and interests under section 363(f) of the Bankruptcy Code (other than Assumed Liabilities as provided in the APA)

15

with liens, interests and encumbrances attaching to the proceeds of the Sale in the same priority as existed prior to the closing of the Sale.

39.     Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of third-party interests only if:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interests; (2) such entity consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (4) such interest is in bona fide dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  Since section 363(f) is written in the disjunctive, any of the five conditions provides authority to sell free and clear of claims, liens and encumbrances.  See generally, *In re Leckie Smokeless Coal Co.*, 99 F.3d 573 (4th Cir. 1996); *In re Gulf States Steel*, *Inc. of Ala.*, 285 B.R. 497, 506 (Bankr. N.D. Ala. 2002).  Therefore, the Court may approve a sale free and clear of liens even if all lien holders have not consented.

40.     The Debtor submits that each lien, claim, encumbrance and interest that is not an Assumed Liability under the APA satisfies at least one of the five conditions of section 363(f) of the Bankruptcy Code.  If an entity with an asserted encumbrance on the Assets objects to the proposed Sale of the Assets, the Debtor intends to demonstrate at the Sale Hearing its satisfaction of the requirements of section 363(f) of the Bankruptcy Code.  Alternatively, the Debtor may sell the Assets free and clear of any other interests under section 363(f)(5) of the Bankruptcy Code, because the

16

lien, claim, encumbrance or interest on any assets sold will attach to the cash proceeds of such Sale in their order of priority and entities holding such interests could be compelled to accept money satisfaction in legal or equitable proceedings. Accordingly, pursuant to section 363 of the Bankruptcy Code, the Debtor may sell the Assets free and clear of all claims, liens and encumbrances.

41.     Specifically, as set forth in the *Final Order Authorizing the Debtor to Use Cash Collateral and Granting Adequate* Protection [Docket No. 65, Pathward, N.A. ("Pathward") holds a first priority security interest against the Debtor's assets as more particularly described in the Security Agreements executed by the Debtor in favor of Pathward dated January 26, 2022 and September 20, 2022 respectively. Upon information and belief, Pathward consents to the sale, which is at a price in excess of the amount owed to Pathward, thereby satisfying §§ 363(f)(2) and (3). Further, the Debtor believes that it could, if needed, satisfy § 363(f) (5) with respect to Pathward.

42.     The Debtor also understands that Cimolai USA, LLC ("Cimolai") asserts a secured claim against the Bankruptcy Estate, despite the findings in the Cash Collateral Order.  The alleged secured claim of Cimolai is strongly in dispute and the Debtor believes it satisfies §§ 363(1), (3), (4), and (5) with respect to the alleged Cimolai claim.  Indeed, the gravamen of the asserted security by Cimolai is the Michigan Builder's Trust Fund Act (the "MBTFA"); however, the Michigan

17

Supreme Court held in *In re Certified Question*, 411 Mich. 727 (1981) that the MBTFA applies only on private construction projects and has no applicability to public construction projects such as the project that Cimolai asserts its claim.

43.     Moreover, the Debtor will send a copy of this Motion to any purported lienholders.  If such lienholders do not object to the proposed Sale, then their consent should reasonably be presumed.  Accordingly, the Debtor requests that unless an entity asserting a lien or encumbrance on any of the Assets (other than with respect to Assumed Liabilities) timely objects to this Motion, such entity shall be deemed to have consented to any Sale approved at the Sale Hearing.

44.     It is also appropriate to sell the Assets free and clear of successor liability relating to the Debtor's business.  Such limitations on successor liability ensure that the Buyer is protected from any claims or lawsuits premised on the theory that the Buyer is a successor in interest to the Debtor.  Courts have consistently held that a buyer of a debtor's assets pursuant to a section 363 sale takes free and clear from successor liability relating to the debtor's business.  See e.g., *In re Tran World Airlines, Inc.*, 322 F.3d 283, 288-90 (3rd Cir. 2003) (sale of assets pursuant to section 363(f) barred successor liability claims for employment discrimination and rights under travel voucher program); *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 585 (4th Cir. 1996) (affirming the sale of debtors' assets free and clear of certain taxes); *In re Insilco Techs., Inc.*, 351 B.R. 313, 322 (Bankr. D. Del. 2006) (stating that a 363

18

sale permits a buyer to take ownership of property without concern that a creditor will file suit based on a successor liability theory).

45.     The purpose of a sale order purporting to authorize the transfer of assets free and clear of all claims, liens, encumbrances and interests would be defeated if claimants could thereafter use the transfer as a basis to assert claims against a buyer arising from a seller's pre-sale conduct. To that end, the Buyer should not be liable under any theory of successor liability relating to the Debtor's business, but should hold the Assets free and clear and a Court Order so providing is one of the conditions precedent to Buyer's closing of the sale.

### b. The Buyer Should Be Entitled to the Protections of Section 363(m) of the Bankruptcy Code

46.     Pursuant to section 363(m) of the Bankruptcy Code, a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims.  See, *In re Made In Detroit, Inc.,* 414 F.3d 576, 581 (6th Cir. 2005); *Miami Ctr. Ltd. P'ship v. Bank of New York*, 838 F.2d 1547, 1554 (11th Cir. 1988); *In re Mark Bell Furniture Warehouse, Inc.*, 992 F.2d 7, 9 (1st Cir. 1993); *In re Willemain v. Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985); *In re Abbotts Dairies of Penn.*, 788 F.2d 143, 147 (3rd Cir. 1986).

47.     The APA was negotiated at arm's-length, with each of the parties represented by its own counsel, and in good faith.  Accordingly, the Debtor requests

that the Sale Order include a provision that the Buyer is a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code. The Debtor maintains that providing the Buyer with such protection was a material consideration inducing the Buyer to enter into the APA.

### c. Assumption and Assignment of Certain Executory Contracts and Unexpired Leases

48. To enhance the value of the bankruptcy estate (by curtailing further administrative liability), the Debtor requests authority under section 365 of the Bankruptcy Code to assume and assign the Assumed Contracts to the Buyer. The Debtor further requests that the Sale Order provide that the Assumed Contracts will be transferred to, and remain in full force and effect for the benefit of, the Buyer notwithstanding any provisions in such assigned contracts and/or leases, including those described in sections 365(b)(2), (f)(1), and (f)(3) of the Bankruptcy Code, that prohibit such assignments.

49. A debtor in bankruptcy may, subject to court approval, assume and assign executory contracts and unexpired leases under section 365 of the Bankruptcy Code. 11 U.S.C. § 365(a). Courts routinely approve motions to assume, assume and assign, or reject executory contracts or unexpired leases upon a showing that a debtor's decision to take such action will benefit the debtor's estate and is an exercise of sound business judgment. *See, e.g., L.R.S.C. Co. v. Rickel Home Ctrs., Inc. (In re*

20

*Rickel Home Ctrs., Inc.*), 209 F.3d 291, 298 (3rd Cir. 2000); *Edwin C. Levy Co. v. McLouth Steel Corp. (In re McLouth Steel Corp.)*, 20 B.R. 688, 692 (Bankr. E.D. Mich. 1982) ("In determining whether a certain contract should be assumed or rejected, the decision should rest on the business judgment of the debtor."); *In re Greektown Holdings, L.L.C.*, No. 08-53104, 2009 WL 1653461, at *1 (Bankr. E.D. Mich. May 13, 2009) (same). The assumption and assignment of the Assumed Contracts related to the Assets is an integral component of the Sale, without which the Sale would not be a viable option.

50. Section 365(b)(1) of the Bankruptcy Code requires that, if there has been a default in a debtor's unexpired lease or executory contract, other than certain nonmonetary defaults as set forth in the statute, such unexpired lease or executory contract may not be assumed unless, at the time of the assumption: (i) such default is cured or there is adequate assurance that such default will be cured, (ii) compensation or adequate assurance of compensation is provided for any actual pecuniary loss resulting from such default, and (iii) adequate assurance of future performance under the lease is provided. 11 U.S.C. § 365(b)(1)(A)-(C).

51. As set forth above, the Debtor will send the Cure Notice to all counterparties to the executory contracts and unexpired leases notifying such counterparties of the potential assumption by the Debtor and assignment to the Buyer of such contract(s) and/or lease(s). The Cure Notice will also set forth the Cure

Amount, if any, owing for each such contract(s) and/or lease(s) according to the Debtor's books and records.

52.    Counterparties to such contract(s) and/or lease(s) will be given sufficient time to object to the proposed Cure Amounts, if any, set forth in the Cure Notice. If no objection is filed with regard to a particular Cure Amount (which again, is contemplated to be at "zero" other than respect to the Modified Lease, such Cure Amount shall be binding on the Debtor, the Buyer and the applicable non-Debtor counterparty. The payment of the Cure Amounts specified in the Cure Notice (or a different amount, either agreed to by the Debtor or resolved by the Court as a result of a timely-filed objection by the relevant non-Debtor counterparty) will be in full and final satisfaction of all obligations to cure defaults and compensate the counterparties for any pecuniary losses under the applicable executory contract(s) and/or lease(s) pursuant to section 365(b)(1) of the Bankruptcy Code, unless the Debtor determines, before the Sale Hearing, that a particular contract or lease is not executory or unexpired, and does not need to be cured to transfer the Assets to the Buyer.

53.    Section 365(f)(2)(B) of the Bankruptcy Code states that a debtor may assign its unexpired leases and executory contracts if, among other things, the assignee provides "adequate assurance of future performance." 11 U.S.C. § 365(f)(2)(B). If necessary, the Buyer will submit written evidence of its ability to

22

provide adequate assurance of future performance under the applicable contracts or leases. The affected non-Debtor counterparties will also be able to challenge the ability of the Buyer to provide adequate assurance.

54. Any assumption and assignment of an Assumed Contract will be subject to all of the provisions of such contract(s) and/or lease(s), to the extent required by applicable law and in accordance with applicable provisions of the Bankruptcy Code. Consequently, assumption and assignment of the Purchased Contracts in connection with the Sale of the Assets is appropriate under the circumstances.

**d. The Form, Manner, and Extent of Notice of the Motion and the Proposed Sale are Appropriate and Adequate Under the Circumstances**

55. The Debtor will serve the notice of this Motion in accordance with applicable Local Rules and will serve this Motion as set forth herein. The notice of the proposed Sale to be provided by the Debtor as set forth herein sufficiently describes the terms and conditions of the proposed Sale.

56. Several sections of the Bankruptcy Code and Bankruptcy Rules dictate the sufficiency of notice and adequacy of service. As discussed below, the content and manner of service of this Motion and the related notices satisfy all such requirements.

57. Section 363 of the Bankruptcy Code provides that a trustee may sell property "after notice and hearing." Under section 102(1) of the Bankruptcy Code,

23

the phrase "after notice and hearing" means "notice as is appropriate in the particular circumstances, and such opportunity for a hearing as is appropriate in the particular circumstances." 11 U.S.C. § 102(1)(A). As set forth above, creditors have been provided notice of the salient details regarding this Motion and the Sale Hearing. Accordingly, notice is sufficient under section 363 of the Bankruptcy Code.

58.     Bankruptcy Rule 6004 requires that notice of sales of property outside of the ordinary course of business complies with Bankruptcy Rule 2002. The Debtor has complied with Bankruptcy Rule 2002. The Sale Notice will be served on all creditors of the bankruptcy estate contemporaneously with the filing of this Motion thereby satisfying this requirement.

59.     The notice of this Motion that are being provided as described herein, including the notice being provided by publication as set forth above, are "reasonably calculated" to apprise interested parties of the pendency of the matter and to afford them an opportunity to object. See, *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950). Parties in interest have been, and should be found to have been, afforded adequate notice of this Motion, the Sale, and the other relief requested herein. The Debtor submits that the notice it has provided and intends to provide as outlined above with respect to the proposed Sale is reasonable and appropriate and constitutes good and adequate notice of the sale of the Assets and the procedures and proceedings related thereto and therefore should be approved by the Court.

24

### e. The Stay of the Sale Order Should Be Waived

60.     Pursuant to Bankruptcy Rules 6004(h), an order authorizing the sale of property is stayed for fourteen (14) days after the entry of an order unless the Court orders otherwise.

61.     The Debtor requests that this Court order that such stay is not applicable with respect to the Sale of the Assets. The Debtor's profit margins have been slim since the commencement of the bankruptcy case and the Debtor has set forth sufficient business justification to pursue a sale of its assets. To delay closing on the Sale will burden the bankruptcy estate and require unnecessary expenditures of the Debtor's limited resources, to the detriment of lien claimants, the holders of administrative expenses, and unsecured creditors. The Debtor notes that requests to waive the stay imposed under Bankruptcy Rules 6004(h) are routinely granted. See, e.g., *In re the Great Atlantic & Pacific Tea Co., Inc.*, No. 15-23007 (SCC) (Bankr. S.D.N.Y. Aug. 11, 2015); *In re Delia's, Inc.*, No. 14-23678 (RDD) (Bankr. S.D.N.Y. Feb. 10, 2015); *In re Midway Games Inc.*, No. 09-10465 (KG) (Bankr. D. Del. June 3, 2009); *In re Nortel Networks Inc.*, No. 09-10138 (Bankr. D. Del. Mar. 3, 2009).

### No Prior Request

62.     No prior request for the relief sought herein has been requested from this Court or any other court.

### Notice

25

63.     Notice of this Motion has been provided to: (a) the Office of the United States Trustee; (b) the Subchapter V Trustee; (c) all persons and entities that have filed a request for service of filings in this chapter 11 case pursuant to Bankruptcy Rule 2002; (d) all taxing and environmental agencies; (e) all Debtors known former and current customers and (f) all parties listed on the Debtors' creditor matrices.

64.     The Debtor submits that, under the circumstances, no other or further notice is required.

**WHEREFORE,** the Debtor respectfully request that the Court grant the relief requested in this Motion and grant the Debtor such other and further relief as this Court deems just and proper.

Respectfully submitted,
**STEVENSON & BULLOCK, P.L.C.**

By: /s/ Elliot G. Crowder
Elliot G. Crowder (P76137)
Counsel for Debtor
26100 American Drive, Suite 500
Southfield, MI 48034
Phone: (248) 354-7906
Facsimile: (248) 354-7907
Email: ecrowder@sbplclaw.com

**OFFSHORE SPARS CO.**

By: /s/ Eric R. Graczyk
Eric R. Graczyk
Its:    Responsible Person

Dated:  November 3, 2023

# EXHIBIT 1

(Proposed Sale Order)

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION - DETROIT

**IN THE MATTER OF:**

Offshore Spars Co., et al.[1]

          Debtors.

Case No. 23-44657
Judge Thomas J. Tucker
Chapter 11

### ORDER (I) APPROVING THE SALE OF ASSETS TO OFFSHORE ACQUISITION, LLC FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES, (II) APPROVING THE ASSET PURCHASE AGREEMENT, (III) TERMINATING ASSET PURCHASE AGREEMENT WITH RIGPRO, LLC (IV), AUTHORIZING ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION WITH THE SALE; AND (V) GRANTING RELATED RELIEF

Upon consideration of the *Motion for Entry of* an Order (i) approving the sale of assets of Offshore Spars Co. (**"Seller"** or **"Debtor**[2]**"**) to Offshore Acquisition, LLC (**"Buyer"**) free and clear of liens, claims and encumbrances, (ii) approving the asset purchase agreement, (iii) terminating asset purchase agreement with RigPro, LLC (iv) authorizing assumption and assignment of executory contracts and unexpired leases in connection with the sale; and (v) granting related relief all as more fully described in the Motion; the Court having reviewed and considered the Motion and all relief related thereto and all pleadings and other

---

[1]     The Debtors in these jointly administered cases are Offshore Spars Co. (Case No. 23-44657) and Eric G. Graczyk (Case No. 23-44658).

[2]     Debtor along with Eric R. Graczyk shall be referred to collectively as **"Debtors"**.

materials submitted in connection therewith (the "**Motion**"); adequate notice of the Motion and opportunity for objection having been given, with no objections having been filed or all objections having been resolved or overruled, as the case may be; no other notice need be given and it appearing that the legal and factual bases set forth in the Motion and any pleadings filed in connection therewith establish just cause for the relief granted herein;

**IT IS HEREBY FOUND AND DETERMINED THAT:**

**<u>Jurisdiction and Venue</u>**

A.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  The Motion is a core proceeding under 28 U.S.C. § 157(b).  Venue is proper in the Court under 28 U.S.C. §§ 1408 and 1409.

B.      The statutory predicates for the relief provided herein are sections 105(a), 363 and 365 of title 11 of the United States Code (the "**Bankruptcy Code**") and Rules 2002, 6004, 6006, 9007, and 9014 of the Bankruptcy Rules and the corresponding local rules.

C.      This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a), and the Court has the constitutional authority to enter a final order with respect to the Motion.  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable to this proceeding by

Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Sale Order, and expressly directs the immediate entry of this Sale Order as set forth herein.

**Notice**

D.      As evidenced by the certificates of service filed with the Court, and based on the representations of Debtors counsel, proper and timely notice of the Motion and the transaction contemplated therein, has been provided to all known parties entitled to notice thereof, in compliance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules and orders of the Court.

E.      On November 3, 2023 the Debtors served Notice of the Motion with a proposed sale order in substantially the same form as this Order by first-class mail, postage prepaid, or by ECF, on (i) all parties who have filed a written request for notice in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002; (ii) the Office of the United States Trustee; (iii) all creditors as set forth on their mailing matrices; (iv) all creditors that assert a lien on Debtors assets; (v) RigPro, LLC; (vi) all parties appearing in the case and any other party required by order of the Bankruptcy Court or applicable Bankruptcy Rules; (vii) all applicable United States, state, tribal, and local regulatory or taxing authorities, recording offices, or any governmental entity that have a reasonably known interest in the relief

requested in the Motion or the transaction set forth therein including all relevant taxing authorities and the Environmental Protection Agency; (viii) the Subchapter V Trustee; and (vix) the Office of the United States Trustee.

F.      Simultaneously with the filing of the Motion, Debtor filed with the Court and served a Notice of Proposed Cure Costs on each entity that were identified in the Asset Purchase Agreement between Buyer and Seller (the "**APA**") [3], as being a counter party having executory contracts that may potentially be assumed and assigned to the Buyer (the "**Potential Assumed Contract Parties**") setting forth the cure amounts, if any, under each executory contracts and unexpired leases (the "**Contract Notice**").

G.      The Contract Notice was served on each of the Potential Assumed Contract Parties by USPS First Class Mail.

H.      The foregoing notices constitutes good and sufficient notice under the particular circumstances, and no other or further notice need be given for the granting of the relief requested herein or entry of this Sale Order. A reasonable opportunity to object or be heard with respect to the Motion and the relief requested therein has been afforded to all interested persons and entities, including (ii) all parties who are known to possess or assert any liens, claims and encumbrances in or upon any of the Debtor's assets being sold under the APA (the

---

[3] Capitalized terms not otherwise defined herein shall have the meaning ascribed in the Asset Purchase Agreement between Buyer and Debtors being hereby approved by this Court by this Order.

"**Assets**"); (iii) all applicable United States, state, tribal, and local regulatory or taxing authorities, recording offices, or any governmental entity that have a reasonably known interest in the relief requested in the Motion or the transaction set forth therein; and (iv) all counterparties to executory contracts and unexpired leases of the Debtor.

**The Sales Process**

I. As set forth in the declaration of Eric R. Graczyk in support of the Motion (the "**Declaration**"), the Debtor is engaged in the business of designing and manufacturing carbon fiber and composite masts and booms for the global superyacht market. The Debtor has additional lines of business including replacement and service of standing and running rigging for yachts, e-commerce, and carbon fiber manufacturing for other industries, including the aerospace and automotive industries (the "**Business**"). The Debtor has a unique business, which caters to a narrow specialty market resulting in limited potential buyers for the Assets. As reflected in the Declaration, the Debtor diligently marketed the Assets to the potential buyer pool both prepetition and during this bankruptcy case (the "**Marketing Process**").

J. The Marketing Process resulted in Seller entering into an asset purchase agreement with RigPro, LLC (the "**RigPro APA**") for a sale of portion of Debtor's assets for $400,000. The RigPro APA was contingent upon, among other

things, the Debtor obtaining Bankruptcy Court approval. The Debtor's business judgement is, and the Bankruptcy Court finds, that continuing to pursue the RigPro APA is not in the best interest of the Debtors or their creditors; the Buyer is uniquely situated and is willing to pay a purchase price and is able to close on a transaction with the Debtor above the RigPro APA and in excess of any other potential buyers; and continuing to pursue a Marketing Process would not likely yield a higher or better offer and would put the sale to the Buyer at risk.

K.      Based on the evidence presented to this Bankruptcy Court, the Debtors marketed the Assets and conducted the sale of the Assets in a full, fair and commercially reasonable manner, and the sale of the Assets to the Buyer pursuant to the APA is the highest and best sale result for the Assets under the circumstances. The consideration provided by the Buyer pursuant to the APA will provide a greater recovery to the Debtors' estates and their creditors than would be provided by any other alternative. The Debtor's determination that the APA constitutes the highest or otherwise best offer for the Assets constitutes a valid and sound exercise of the Debtor's business judgment.

**The Transaction**

L.      The APA contemplates the sale of the Assets to the Buyer pursuant to the terms and conditions thereof (the "**Transaction**"). The APA requires the sale of the Assets, which are property of the Seller's bankruptcy estate under

Bankruptcy Code § 541, and, except as otherwise provided in the APA (and other than the Assumed Liabilities (as defined and provided for in the APA) or as otherwise expressly provided in this Sale Order), such sale will be free and clear of (i) all liens (statutory or otherwise), claims, mortgages, deeds of trust, pledges, charges, security interests, rights of first refusal, hypothecations, encumbrances, royalties, easements, servitudes, leases or subleases, rights-of-way, encroachments, restrictive covenants, restrictions on transferability or other similar restrictions, rights of offset or recoupment, right of use or possession, subleases, leases, conditional sale arrangements or, any dedication under any gathering, transportation, treating, purchasing, or similar agreement that relates to any Assumed Contract and any other such contract that is not assumed by or assigned to Buyer, (ii) all claims as defined in Bankruptcy Code § 101(5), including all rights or causes of action (whether in law or in equity), proceedings, warranties, guarantees, indemnities, rights of recovery, setoff, recoupment, indemnity or contribution, obligations, demands, restrictions, indemnification claims, or liabilities relating to any act or omission of the Debtors or any other person prior to the Closing (as defined below), consent rights, options, contract rights, covenants, and interests of any kind or nature whatsoever (known or unknown, matured or unmatured, accrued or contingent, and regardless of whether currently exercisable), whether arising prior to or subsequent to the commencement of these

bankruptcy cases, and whether imposed by agreement, understanding, law, equity, or otherwise, and (iii) all debts, liabilities, obligations, contractual rights and claims, and labor, employment and pension claims, in each case, whether known or unknown, choate or inchoate, filed or untiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or un-matured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the commencement of these bankruptcy cases, and whether imposed by agreement, understanding, law, equity, or otherwise ((i), (ii), and (iii), collectively, the "**Interests**").  Except for the Assumed Liabilities, the Sale shall be free and clear of, and the Buyer shall not be responsible for any Interests, including, without limitation, in respect of the following:  (i) any rights or Interests based on any successor or transferee liability, (ii) any Interests that purport to give any party a right or option to effect any forfeiture, modification, right of first offer or first refusal, or termination of the Debtor's or the Buyer's interest in the Assets, or any similar rights; (iii) any labor or employment agreements; (iv) mortgages, deeds of trust, and security interests; (vi) any pension, multiemployer plan (as such term is defined in § 3(37) or § 4001(a)(3) of ERISA), health or welfare, compensation, or other employee benefit plans, agreements, practices, and programs, including, without limitation, any pension plans of the Debtor or any

multiemployer plan to which the Debtor has at any time contributed to or had any liability or potential liability; (vii) any other employee, worker's compensation, occupational disease, or unemployment or temporary disability related claim, including, without limitation, claims that might otherwise arise under or pursuant to (a) the Employee Retirement Income Security Act of 1974, as amended, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Age Discrimination and Employment Act of 1967 and Age Discrimination in Employment Act, as amended, (g) the Americans with Disabilities Act of 1990, (h) the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, including, without limitation, the requirements of Part 6 of Subtitle B of Title I of ERISA and § 4980B of the Internal Revenue Code and of any similar state law, (i) state discrimination laws, (j) state unemployment compensation laws or any other similar state laws, (k) any other state or federal benefits or claims relating to any employment with the Debtor or any of its predecessors, or (l) the WARN Act (29 U.S.C. §§2101 et seq.); (viii) any bulk sales or similar law; (ix) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code, as amended, and any taxes arising under or out of, in connection with, or in any way relating to the operation of the Assets prior to the Closing, including, without limitation, any ad valorem taxes assessed by any applicable taxing authority; (xii) any unexpired

and executory contract or unexpired lease to which a Debtor is a party that is not an Assumed Contract that will be assumed and assigned pursuant to this Sale Order and the APA; (xiii) any Retained Liabilities (as defined and provided in the APA) ((i) through (xiii), collectively, the "**Liens, Claims and Encumbrances**"). A sale of the Assets other than one free and clear of all Liens, Claims and Encumbrances would yield substantially less value for the Debtors' estates, with less certainty, than the transaction as contemplated by the APA (the "Transaction"). Therefore, the Transaction and approved herein free and clear of all the Liens, Claims and Encumbrances, except for the Assumed Liabilities, is in the best interests of the Debtors, their estates and creditors, and all other parties-in-interest.

M.     The Debtors have full power and authority to execute, deliver, and consummate the APA and all other documents contemplated thereby. No consents or approvals, other than those expressly provided for in the APA, are required for the Seller to consummate the Transaction pursuant to the APA.

N.     The APA was negotiated, proposed, and entered into by and between the Seller, on the one hand, and the Buyer, on the other hand, without collusion, in good faith, and from arm's length bargaining positions. The Buyer is not an "insider" or "affiliate" of the Debtors as those terms are defined in the Bankruptcy Code. Neither the Buyer nor any of its affiliates or agents have any connection or agreements with the Debtors other than the APA, and neither the Debtors nor the

Buyer has engaged in any conduct that would cause or permit the application of Bankruptcy Code § 363(n) to the Transaction, including voiding the Transaction or APA or any of the transaction documents and related instruments contemplated thereunder.

O.      The Buyer is purchasing the Assets in good faith and is a good faith Buyer within the meaning of Bankruptcy Code § 363(m).  The Buyer has proceeded in good faith in all respects in connection with the sales process, including, but not limited to, disclosing all agreements and all payments to be made by the Buyer with respect to the transactions set forth in the APA.  The Buyer is therefore entitled to all of the protections afforded under Bankruptcy Code § 363(m).

P.      The terms and conditions of the APA (i) are fair and reasonable; (ii) valid, binding, and enforceable; (iii) constitute the highest and best offer for the Assets; (iv) will provide a greater recovery for the Debtors estate's creditors than would be provided by any other practical available alternative; and (v) constitute reasonably equivalent value and fair consideration for the Assets (as those terms are defined in the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, Bankruptcy Code § 548, and the laws of the United States; any state, tribe, territory, or possession of the United States; and the District of

Columbia). No other person, entity, or group of entities has offered to purchase the Assets for greater overall value to the Debtors' estates than the Buyer.

Q. The Transaction was not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or under the laws of the United States or any state, tribe, territory, or possession of the United States, including the District of Columbia. Neither the Debtors nor the Buyer is fraudulently entering into the Transaction contemplated by the APA.

R. The Court adopts and approves the judgment of the Debtors that the relief sought in the Motion, including approval of the APA and other documents necessary to effectuate the sale of the Assets to the Buyer and consummation of the Transaction contemplated thereunder, is in the best interests of the Debtors' bankruptcy estates, creditors, and all parties in interest. The Debtors have demonstrated good, sound, and sufficient business purpose and justification, and it is a prudent exercise of the Debtors' business judgment, to sell the Assets on the terms and conditions contained in the APA and to consummate the transaction contemplated thereunder. Because time is of the essence, the Debtors have good business reasons to sell the Assets prior to obtaining the Bankruptcy Court's confirmation of a plan, and the Transaction set forth in the APA does not constitute a *sub rosa* plan or dictate the terms of a plan for of the Debtors' estates.

S.     The Buyer would not have entered into the APA and will not consummate the transaction described therein (thus adversely affecting the bankruptcy estates and their creditors) if the Assets are not sold free and clear of any and all Liens, Claims and Encumbrances.

T.     The Seller has full corporate power and authority and is authorized to consummate the transactions and sell and transfer the Assets to the Buyer free and clear of any and all Liens, Claims and Encumbrances because one or more of the standards enumerated in Bankruptcy Code § 363(f) has been satisfied.  All parties with Liens, Claims and Encumbrances in or upon the Assets who did not object, or who withdrew their objections to the Transaction, are deemed to have consented pursuant to Bankruptcy Code § 363(f)(2).  All parties with Liens, Claims and Encumbrances in or upon the Assets who did object to the sale of the Assets to the Buyer fall within one or more of the other subsections of Bankruptcy Code § 363(f) and are adequately protected by having their Liens, Claims and Encumbrances attach to the net proceeds of the sale of the Assets with the same validity, enforceability, priority, force, and effect that they now have as against the Assets, subject to the rights, claims, defenses, and objections, if any, of the Debtors and all parties-in-interest with respect to such Liens, Claims and Encumbrances.

U.     Except as otherwise specifically set forth in this Sale Order or the APA, the closing of the Transaction under the APA (the "**Closing**") will not

subject the Buyer to any Liens, Claims and Encumbrances of or against the Debtors or any other person.

V.     The Seller's assumption and assignment of the Assumed Contracts is (i) an exercise of its sound business judgment and (ii) in the best interests of the Seller's estate and creditors.

W.     The Seller has provided the counterparties to the Assumed Contracts with adequate assurance that it will promptly cure any defaults under the Assumed Contracts pursuant to Bankruptcy Code § 365(b)(1), and the Buyer has provided such counterparties with adequate assurance of future performance within the meaning of Bankruptcy Code §§ 365(b)(1)(C), 365(b)(3), and 365(f)(2)(B).

X.     Pursuant to Bankruptcy Code § 365 and Bankruptcy Rule 6006, the amounts set forth on the Contract Notice constitute the cure cost, if any, due and owing under the Assumed Contracts (collectively, the "**Cure Amounts**" and each a "*Cure Amount*") and will be fixed and allowed for the Assumed Contracts.  No other amounts are due and owing by the Seller under the Assumed Contracts.  The Buyer will pay the Cure Amounts at the Closing, and the Debtors shall not have any obligation to pay the Cure Amounts, and the Debtors shall not be responsible for the obligations under the Assumed Contracts that arise after the Closing.  Upon payment of such amounts by the Seller, all monetary and non-monetary defaults, if any, under and related to the Assumed Contracts will be deemed to be cured.

Upon the assignment of the Assumed Contracts, the Buyer shall be deemed to be in full compliance with all provisions of the Assumed Contracts.

Y.     The Lessor with respect to the Facility has agreed to assumption and assignment of the Facility Lease pursuant to the terms of the Modified Lease.

Z.     The consummation of the sale of the Assets to the Buyer is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, Bankruptcy Code §§ 105(a), 363(b), 363(f), 363(m), and 365.

AA.    Buyer has incurred significant advisor fees and expenses in pursuing the Transaction (the "**Buyer's Costs**").  The APA contains a provision providing that if the Closing does not occur in accordance with the Agreement and Buyer has defaulted under or breached the Agreement, then Seller's liquidated damages will in the amount of $10,000 and Buyer shall have no further Liabilities of any kind arising out of or relating to such default or breach (the "**Damage Limitation**"). The Damage Limitation is fair and reasonable under the circumstances of this case including the Buyer's Costs incurred and Debtors circumstances.

**ACCORDINGLY, THE COURT ORDERS THAT:**

1.     The relief requested in the Motion, the Transaction including the sale of the Assets to the Buyer pursuant to the APA, is granted and approved in its entirety.

2.     To the extent objections to the Motion and Transaction have not been withdrawn, waived, or settled, such objections and all reservations of right included therein are overruled on the merits.  The parties who did not object or who withdrew their objections to the Motion and Transection are deemed to have consented to the Transaction contemplated under the APA pursuant to section 363(f)(2) of the Bankruptcy Code.

3.     The RigPro APA is terminated without any further obligations or Claims of any kind or nature of the Debtors, their estates, or Buyer.

**Approval of the Transaction**

4.     The APA (and any such other document(s) or modifications as may be required and/or necessary to effectuate the sale of the Assets to the Buyer) is approved in its entirety, and the Debtors are authorized to consummate the transaction set forth in the APA and to satisfy all covenants and obligations set forth therein.

5.     The Debtors' entry into Transaction with the Buyer, entry into the APA, and consummation of the Transaction contemplated thereunder are approved pursuant to Bankruptcy Code §§ 105(a), 363, and 365.

6.     The terms of the APA are fair and reasonable, and the Transaction set forth therein shall be deemed for all purposes to constitute a transfer for reasonably

equivalent value and fair consideration under the Bankruptcy Code and any other applicable law.

7. The Debtors have full corporate power and authority and are authorized and directed under Bankruptcy Code §§ 105(a), 363, and 365 to perform their obligations under the APA and to execute all such other documents and take all such other actions that are reasonably necessary to effectuate the Transactions contemplated by the APA.

8. The Buyer shall not be required to seek or obtain relief from the automatic stay under Bankruptcy Code § 362 to enforce any of its remedies under the APA or any other sale-related document. The automatic stay imposed by Bankruptcy Code § 362 is modified solely to the extent necessary to implement the provisions of this Sale Order and the sale of the Assets to the Buyer. Further, the Debtors have full power and authority and are authorized and directed upon Seller's receipt of the Purchase Price (as defined in the APA) to execute and deliver such other documents as are necessary to sell to the Buyer good, valid, legal, and indefeasible title to the Assets free and clear of any and all Liens, Claims and Encumbrances pursuant to Bankruptcy Code § 363(f). Execution and delivery by the Debtors shall have the same effect as if done by the party ordered to execute and deliver such document but who failed to comply with this Sale Order (the "**Non-Compliant Party**"). The Debtors shall have no liability or responsibility for

any liability or other obligation of the Non-Compliant Party arising under or related to the execution and delivery of such documents, and all parties, including, but not limited to, the Non-Compliant Party, are prohibited from asserting, prosecuting, or otherwise pursuing any claim against the Debtors as a result of execution and delivery of such documents.

9.      The proceeds from the sale of the Assets shall be held by the Seller with Liens, Claims and Encumbrances attaching to the proceeds of the sale with the same validity, enforceability, priority, and force and effect as they had against the Assets immediately prior to the Closing and shall be distributed only pursuant to further order of this Court.

**Sale and Transfer of the Assets to the Buyer Free and Clear of Any and All Liens, Claims and Encumbrances**

10.      Except as otherwise provided in this Sale Order or the APA, on the Closing, the Assets shall be sold and/or otherwise transferred to the Buyer free and clear of any and all Liens, Claims and Encumbrances or other interests of any kind or nature, regardless of whether such Liens, Claims and Encumbrances are paid in full by the Seller, except as otherwise provided in this Sale Order or the APA. Any and all Liens, Claims and Encumbrances related to the Assets shall attach solely to the sale proceeds of the Assets with the same validity, enforceability, priority, and force and effect as they had against the Assets immediately prior to the Closing,

and subject to the rights, claims, defenses, and objections, if any, of the Debtors and all parties in interest with respect to such Liens, Claims and Encumbrances.

11. Upon the Closing, except as otherwise provided in this Sale Order or the APA, all parties holding claims against the Debtors or their estates, whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated, arising before the Closing or with Liens, Claims and Encumbrances in or against the Assets existing before the Closing, shall be, and hereby are, with respect to any and all such Liens, Claims and Encumbrances, permanently enjoined from: (a) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative, or other forum) against or affecting, directly or indirectly, the Buyer or the Assets, or any direct or indirect transferee of any of the Assets, or direct or indirect successor in interest to, the Buyer; (b) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree, or order against the Buyer or the Assets or any direct or indirect transferee of any of the Assets, or direct or indirect successor in interest to, the Buyer; (c) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any and all Liens, Claims and Encumbrance of any

kind against the Buyer or the Assets, or any direct or indirect transferee of any of the Assets, or successor in interest to, the Buyer; (d) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of this Sale Order; and (e) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of this Sale Order.

12.     The sale and transfer of the Assets pursuant to this Sale Order and the APA will vest the Buyer with valid and indefeasible title to the Assets, and will be a legal, valid, and effective sale and transfer of the Assets free and clear of any and all Liens, Claims and Encumbrances.

**Assumption and Assignment of Assumed Contracts**

13.     The Seller has satisfied the requirements of Bankruptcy Code §§ 365(b)(1) and 365(f)(2).

14.     The Assumed Contracts will be assumed and assigned to the Buyer in accordance with their respective terms and in accordance with the findings of the Court in this Sale Order.  The Assumed Contracts will remain in full force and effect notwithstanding any provision in such documents to the contrary (including provisions of the type described in Bankruptcy Code §§ 365(b)(2), (e)(1), and (f)(1) which prohibit, restrict, or condition such assignment or transfer).  All

counterparties to the Assumed Contracts are deemed to have consented to the assignment, if consent was not otherwise obtained in accordance with the APA.

15.     The Cure Amounts, if any, for the Assumed Contracts are fixed in the respective amounts set forth on the Cure Notice.  All defaults, claims, or other obligations of the Debtors arising or accruing under each of the Assumed Contracts, if any, prior to assumption (without giving effect to any acceleration clauses or any default provisions of the kind specified in  Bankruptcy Code § 365(b)(2)) will be cured by the Buyer in accordance with the APA, by paying the Cure Amounts, if any, and the Debtors shall not have any obligation to pay the Cure Amounts.  No other or further monetary amounts or obligations are due or existing under or related to the Assumed Contracts by the Debtors, whether pursuant to Bankruptcy Code § 365(b)(1) or otherwise.  The Buyer will pay the Cure Amounts, if any, in accordance with the terms and provisions set forth in the APA and this Sale Order.

16.     The Modified Lease will become effective upon the Closing and all defaults, claims, or other obligations of the Debtor arising or accruing under the Facility Lease shall be deemed to have been fully cured pursuant to the terms of the Modified Lease.

17.     The assumption and assignment of Assumed Contracts will become effective upon the Closing.  The Seller shall serve upon the counterparties to the

Assumed Contracts a notice confirming that the Transaction has closed and the Assumed Contracts have been assumed and assigned to Buyer. Subject to the terms of this Sale Order and the APA, the Buyer assumes all rights and obligations of the Seller under the Assumed Contracts. Pursuant to Bankruptcy Code § 365(k), upon the assignment of the Assumed Contracts to the Buyer, (a) the Seller and bankruptcy estate are relieved from any and all liability for any breach of the Assumed Contracts occurring after assignment to the Buyer; and (b) and the Buyer shall be responsible for the obligations under the Assumed Contracts that arise after the Closing.

18.     All counterparties to the Assumed Contracts are forever enjoined and estopped from contesting the Cure Amounts, if any, and from asserting any default against the Debtors or Buyer which existed as of the date of the Sale Hearing. Upon the assignment of the Assumed Contracts, the Buyer shall be deemed to be in full compliance with all provisions of the Assumed Contracts.

19.     Upon the Seller's assignment of the Assumed Contracts to the Buyer, no monetary or non-monetary default will exist under or relate to the Assumed Contracts (or any documents related thereto). Upon entry of this Sale Order and the assumption and assignment of the Assumed Contracts, the Buyer is deemed to be in compliance with all terms and provisions of the Assumed Contracts.

20.     Nothing in this Sale Order, the Motion or in any notice or any other document is or shall be deemed an admission by the Debtors that any contract is an executory contract and/or unexpired lease or must be assumed and assigned pursuant to the APA or in order to consummate the Transaction.

21.     Any objections that object solely to the Cure Amounts may not prevent or delay the Debtor's assumption and assignment of the Assumed Contracts or the sale of the Assets. If a party objects solely to the Cure Amount of an Assumed Contract, the Seller may hold the claimed Cure Amount in reserve pending further order of the Court or mutual agreement of the parties. So long as the Seller holds the claimed Cure Amount in reserve, and there are no other unresolved objections to assumption and assignment, the Debtor can, without further delay, assume and assign the Assumed Contract that is the subject of the objection. If the parties are able to resolve the dispute with respect to the Cure Amount, they may file with the Court a notice signed by both parties that establishes the Cure Amount without further order of the Court. If the parties are unable to resolve the dispute with respect to the Cure Amount, the Court shall determine the Cure Amount at a future hearing. Under such circumstances, the objecting party's recourse is limited to the funds held in reserve. For purposes of this paragraph, the term "party" shall mean one or all of the following: the Debtor, the non-debtor counterparty to the Assumed Contract, and the Buyer.

**Miscellaneous Provisions**

22.    The Purchase Price, which will be paid by the Buyer for the Assets, is fair and reasonable and may not be avoided under Bankruptcy Code § 363(n) or other applicable law.

23.    All persons and entities that are in possession of some or all of the Assets on the Closing Date are directed to surrender possession of the Assets to the Buyer.

24.    This Sale Order is and shall be effective as a determination that, on the Closing, any and all Liens, Claims and Encumbrances and claims existing as to the Assets before the Closing have been unconditionally released, discharged, and terminated in each case as to the Assets.

25.    Except as otherwise provided in this Sale Order or as specifically set forth in the APA, the Buyer shall have no liability or responsibility for any liability or other obligation of the Debtors arising under or related to the Assets.  Without limiting the generality of the foregoing, and except as set forth in the APA with respect to the Assumed Liabilities, the Buyer shall not be liable for any claims against the Debtors or any of their predecessors, and the Buyer shall have no successor, transferee, or vicarious liabilities of any kind or character, whether known or unknown, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtors or any obligations of the Debtors arising before the

Closing, including liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of the Debtor before the Closing.

26.     Under no circumstances shall the Buyer be deemed a successor of or to the Debtors for any and all Liens, Claims and Encumbrances against or in the Seller or the Assets.  The Buyer is not a mere continuation of the Seller or Debtors' estates, and there is no continuity of enterprise between the Seller and the Buyer. The Buyer is not holding itself out to the public as a continuation of the Seller. The Buyer is not a successor to the Seller, Debtors or their estates, and the Transaction does not amount to a consolidation, merger, or de factor merger of the Buyer and the Seller.  Under no circumstances shall the Buyer be deemed a successor of or to the Seller or Debtors for any and all Liens, Claims and Encumbrances against or in the Seller or the Assets.

27.     The sale and transfer of the Assets pursuant to the APA shall not subject the Buyer to any claim, cause of action, indebtedness, or other liability with respect to the business or operation of the Seller before the Closing or by reason of such transfer under the Bankruptcy Code or applicable federal and state law, based, in whole or in part, directly or indirectly, on any theory of law or equity, including any theory of equitable subordination, successor or transferee liability, or vicarious liability.

28.     No person shall take any action to prevent, enjoin, or otherwise interfere with consummation of the transactions contemplated in or by the APA or this Sale Order.

29.     Each and every federal, state, and local governmental agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA and this Sale Order.

30.     Any person or entity that has filed financing statements, mortgages, deeds, lis pendens, or other documents or agreements evidencing interests in the Assets shall deliver to the Seller prior to Closing (in proper form for filing and executed by the appropriate parties) termination statements, instruments of satisfaction, and/or releases of all interests that the party has concerning the Assets. In the event that any such person or entity shall not have delivered to the Seller such termination statements, instruments of satisfaction, and/or releases of all interests that the party has concerning the Assets before the Closing, (a) the Debtor is authorized and directed to execute and file such statements, instruments, releases, and other documents on behalf of the party concerning the Assets; and (b) the Buyer is authorized to file, register, or otherwise record a certified copy of this Sale Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of any and all Liens, Claims and Encumbrances

in the Assets.  Execution and delivery by the Seller in accordance with this Sale Order shall have the same effect as if done by any Non-Compliant Party.  The Debtors shall have no liability or responsibility for any liability or other obligation of the Non-Compliant Party arising under or related to the execution and delivery of such documents, and all parties, including but not limited to the Non-Compliant Party, are prohibited from asserting, prosecuting, or otherwise pursuing any claim against the Debtors as a result of execution and delivery of such documents.

31.     The APA and any related agreements, documents, or other instruments may be modified, amended, or supplemented through a written document signed by the parties thereto  in accordance with the terms thereof without further order of the Bankruptcy Court; *provided, however*, that any such modification, amendment, or supplement is neither material nor changes the economic substance of the transactions contemplated under the APA and, to the extent practicable, shall be provided to the any party directly affected by the modification, amendment or supplement for review and comment at least two (2) business days prior to being executed by the Seller before otherwise becoming effective, during which time the directly impacted party may file an objection to such modification, amendment or supplement with the Court.

32.     The Debtors have full corporate power and authority and are authorized and directed under Bankruptcy Code § 363(b)(1) to perform all of their

obligations in connection with the APA in accordance with the terms thereof and this Sale Order and to execute all such documents and take such other actions necessary or required to effectuate the Transaction.

33.     The terms of this Sale Order and the APA shall be binding on and inure to the benefit of the Buyer, the Debtors and their estates, the Debtors' creditors and all other parties-in-interest, and any successors and assigns of such parties, including any subsequent trustee or examiner appointed in these Cases or any subsequent or converted case of Debtors under chapter 7 or chapter 11 of the Bankruptcy Code.

34.     With respect to the transactions contemplated under the APA and approved and authorized herein, the Buyer is a Buyer in good faith within the meaning of Bankruptcy Code § 363(m) and shall be entitled to the protections of Bankruptcy Code § 363(m) in the event this Sale Order or any authorization contained herein is reversed or modified on appeal.  To the fullest extent permitted by Bankruptcy Code § 363(m), the reversal or modification of this Sale Order shall not affect the validity of the sale, transfer, and assignment of the Assets in accordance with the terms of this Sale Order.

35.     No bulk sales law or any similar law of any state or other jurisdiction applies in any way to the sale of the Assets to the Buyer.

36. Nothing in this Sale Order or the APA (a) releases, nullifies, precludes, or enjoins the enforcement of any liability to a governmental unit under police and regulatory statutes or regulations that any entity would be subject to as the owner or operator of property after the date of entry of this Sale Order or (b) authorizes the transfer or assignment to the Buyer of any license, permit, registration, authorization, or approval of, or the discontinuation of any obligation thereunder, or with respect to a governmental unit without the Buyer's complying with all applicable legal requirements under non-bankruptcy law governing such transfers or assignments.

37. This Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Sale Order and the APA, and all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection therewith to which the Debtors are a party or which have been assigned to the Buyer, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Transaction, including but not limited to, retaining jurisdiction to (a) compel delivery of the Assets to the Buyer, (b) interpret, implement, and enforce the provisions of this Sale Order, and (c) protect the Buyer against any and all Liens, Claims and Encumbrances in or against the Debtors or the Assets of any kind or nature whatsoever.

38.     Nothing contained in any plan of reorganization or liquidation, or order of any type or kind entered in (a) these Cases, (b) any subsequent chapter 7 case into which the chapter 11 case may be converted or (c) any related proceeding subsequent to entry of this Sale Order, shall conflict with or derogate from the provisions of the APA (as modified by this Sale Order) or the terms of this Sale Order.

39.     If the Closing does not occur in accordance with the Agreement and Buyer has defaulted under or breached the Agreement, then Seller's liquidated damages will be limited to the amount of $10,000 and Buyer shall have no further Liabilities of any kind arising out of or relating to such default or breach or the APA.

40.     For good cause shown, this Sale Order shall take effect immediately and shall not be stayed pursuant to Bankruptcy Rules 6004(h), 6006(d), 7062, or 9014 or other applicable law or procedural rules.  The Sellers and the Buyer are authorized to close the Transaction immediately upon entry of this Sale Order and are authorized to satisfy the conditions to Closing (as set forth in the APA), as soon as reasonably practicable.

41.     Pursuant to section 1146(a) of the Bankruptcy Code, the sale of the Assets shall not be taxed under any law imposing a stamp tax or similar tax.

# **EXHIBIT 2**

(Notice and Opportunity to Object)

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION - DETROIT**

**IN THE MATTER OF:**

| | |
|---|---|
| Offshore Spars Co., et al.[1] | Case No. 23-44657 |
| | Judge Thomas J. Tucker |
| Debtors. | Chapter 11 |
| | Jointly Administered |

**NOTICE AND OPPORTUNITY TO OBJECT TO MOTION FOR ENTRY OF AN
ORDER (I) APPROVING THE SALE OF ASSETS TO OFFSHORE ACQUISITION,
LLC FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES, (II)
APPROVING THE ASSET PURCHASE AGREEMENT, (III) TERMINATING ASSET
PURCHASE AGREEMENT WITH RIGPRO, LLC (IV), AUTHORIZING ASSUMPTION
AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN
CONNECTION WITH THE SALE; AND (V) GRANTING RELATED RELIEF**

PLEASE TAKE NOTICE that Offshore Spars Co. (the "Debtor"), by and through its counsel, Stevenson & Bullock, P.L.C., has filed a Motion (the "Motion") for Entry Of An Order (I) Approving the Sale of Assets to Offshore Acquisition, LLC Free and Clear of Liens, Claims and Encumbrances, (II) Approving the Asset Purchase Agreement, (III) Terminating Asset Purchase Agreement with Rigpro, LLC (IV), Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with the Sale; and (V) Granting Related Relief. By the Motion, the Debtor seeks, *inter alia*, to sell (the "Sale") substantially all of its assets (the "Assets") and to assume and assign certain executory contracts and unexpired leases (the "Purchased Contracts") to Offshore Acquisition, LLC (the "Buyer") pursuant to an asset purchase agreement by and among the Debtor and the Buyer (the "APA").

The Motion and the order (the "Proposed Sale Order") proposed to the Court approving the Motion can be obtained by contacting Debtor's counsel as set forth below or through the Court's electronic filing system.

The APA contains the following salient terms[2]:

a.    Purchase Price: Under section 2.5(a) of the APA, the aggregate consideration (the "Purchase Price") for the purchase, sale, assignment, and conveyance of the Assets consists of: (i) cash (the "Cash Consideration") in an amount equal to $2,430,000.00, less the Cash on Hand.

---

[1]     The Debtors in these jointly administered cases are Offshore Spars Co. (Case No. 23-44657) and Eric R. Graczyk (Case No. 23-44658).

[2]     This paragraph is a summary of the terms of the APA only. Parties are encouraged to review the APA and the Proposed Sale Order in their entirety. To the extent that a conflict exists between this Notice or the Motion and the APA , the APA controls.

b.     <u>Assets:</u> Section 2.1 of the APA provides that the Buyer shall purchase substantially all of the Debtor's assets, as defined as the Purchased Assets therein with all assets to be received free and clear of any Claims, liens, encumbrances and interests which includes, but is not limited to, free and clear of successor and warranty claims.

c.     <u>Assumed Liabilities:</u> Section 2.3 of the APA provides that the Buyer will not assume or perform any liabilities of the Debtor other than those set forth therein.

d.     <u>Closing.</u>  Pursuant to Section 2.6 of the APA, the closing shall take place on the occurrence of the latest of the following: (i) the fifth business day the fifth Business Day after entry of the Sale Order; (ii) Buyer receiving Acceptable Environmental Reports, and (iii) January 12, 2024.

e.     <u>Closing Conditions.</u>  Pursuant to Section 6.2 of the APA, the closing is conditioned upon, *inter alia*, the Bankruptcy Court shall have entered the Sale Order and it shall not be subject to a stay pending appeal; Buyer shall have received Acceptable Environmental Reports; the Buyer shall be satisfied in its sole discretion with its legal, financial, accounting, product, operations, environmental, and other diligence of Seller, the Company, the Business, and the Purchased Assets; and the landlord of the Debtor's facility having executed an amended and modified lease acceptable to Buyer in its sole discretion (the "<u>Modified Lease</u>") and entry of an order by the Bankruptcy Court acceptable to the Buyer in its sole discretion (which provisions may be included in the Sale Order) authorizing and approving the assumption and assignment of the Modified Lease and establishing the cure amount not to exceed $27,500.00.

**<u>Your rights may be affected.</u>  You may wish to review the Motion and discuss it with your attorney, if you have one in this bankruptcy case.  If you do not have an attorney, you may wish to consult one.**

If you wish to object to the Court granting the relief sought in the Motion, or if you want the Court to otherwise consider your views on the Motion, within twenty-one (21) days of service of the Motion, **or such shorter time as the Court may hereafter order**, you or your attorney must:

1. File with the Court a written response or an answer[3] explaining your position at:

United States Bankruptcy Court
211 West Fort Street
Detroit, Michigan 48226

---

[3]     Response or answer must comply with FED.R.CIV.P. 8(b), (c), and (e).

If you mail your response to the Court for filing, you must mail it early enough so the Court will receive it on or before the date stated above.

You must also mail a copy to:

Stevenson & Bullock, P.L.C.
Attn.: Elliot G. Crowder
26100 American Drive, Suite 500
Southfield, Michigan 48034

-and-

Office of the United States Trustee
211 West Fort Street, Suite 700
Detroit, Michigan 48226

If a response or answer is timely filed and served, the clerk may schedule a hearing on the Motion and you will be served with a notice of the date, time, and location of the hearing.

If you or your attorney do not take these steps, the Court may decide that you do not oppose the relief sought in the Motion and may enter an Order granting the relief sought therein.

Respectfully submitted,
**STEVENSON & BULLOCK, P.L.C.**

By: /s/ Elliot G. Crowder
Elliot G. Crowder (P76137)
Counsel for Debtor
26100 American Drive, Suite 500
Southfield, MI 48034
Phone: (248) 354-7906
Facsimile: (248) 354-7907
Dated: November 3, 2023        Email: ecrowder@sbplclaw.com

# EXHIBIT 3

(Brief – Not applicable)

# **EXHIBIT 4**
(Certificate of Service – filed separately)

# EXHIBIT 5

(Declaration of Eric Graczyk)

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION - DETROIT

**IN THE MATTER OF:**

| | |
|---|---|
| Offshore Spars Co., et al.[1] | Case No. 23-44657 |
| | Judge Thomas J. Tucker |
| Debtors. | Chapter 11 |
| | Jointly Administered |

## DECLARATION OF ERIC GRACZYK IN SUPPORT OF DEBTOR'S MOTION FOR ENTRY OF AN ORDER (I) APPROVING THE SALE OF ASSETS TO OFFSHORE ACQUISITION, LLC FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES, (II) APPROVING THE ASSET PURCHASE AGREEMENT, (III) TERMINATING ASSET PURCHASE AGREEMENT WITH RIGPRO, LLC (IV), AUTHORIZING ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION WITH THE SALE; AND (V) GRANTING <u>RELATED RELIEF</u>

In support of the Motion (the "<u>Motion</u>")[2] for Entry Of An Order (I) Approving the Sale of Assets to Offshore Acquisition, LLC Free and Clear of Liens, Claims and Encumbrances, (II) Approving the Asset Purchase Agreement, (III) Terminating Asset Purchase Agreement with Rigpro, LLC (IV), Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with the Sale; and (V) Granting Related Relief filed on behalf of Offshore Spars Co. (the "<u>Debtor</u>"), I, Eric R Graczyk, declare as follows:

---

[1]    The Debtors in these jointly administered cases are Offshore Spars Co. (Case No. 23-44657) and Eric G. Graczyk (Case No. 23-44658).

[2]    Capitalized terms as used herein have the meanings ascribed to them in the Motion, unless otherwise stated.

1. Except as otherwise stated herein, I make this declaration upon personal knowledge and, if called as a witness, could competently testify to the facts contained herein.

2. I am the responsible person for the Debtor.

3. On May 23, 2023 (the "Petition Date") the Debtor filed a voluntary petition for relief in this Court under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code").

4. The Debtor continues to manage and operate its business as debtor-in-possession pursuant to, *inter alia*, § 1184 of the Bankruptcy Code.

5. Deborah Fish has been appointed Subchapter V Trustee in above-captioned jointly administered cases.

6. The Debtor was established in 1976 and its primary business is designing and manufacturing carbon fiber and composite masts and booms for the global superyacht market. The Debtor has additional lines of business including replacement and service of standing and running rigging for yachts, e-commerce, and carbon fiber manufacturing for other industries, including the aerospace and automotive industries.

7. In January 2022, the Debtor was acquired by Graczyk Holdings, LLC, a Michigan limited liability company whose sole member is me. Not until after the purchase of the Debtor did I discover numerous financial improprieties, breaches of

warranties, and general mismanagement that had befallen the Debtor under previous ownership. Though I spent considerable time and effort prior the Petition Date attempting to remedy such matters, a reorganization of the business through a Subchapter V bankruptcy became necessary.

8.     Notwithstanding the Debtor's best efforts, profitability has been a material concern during the bankruptcy process as customer demands, market conditions, and creditor pressure have caused issues to the daily operations and financial well-being of the Debtor.

9.     The Debtor's business platform is very specialized operates in a limited marketspace and has a unique and limited customer base as well as limited potential purchasers for the Debtor's assets. Both before and during the pendency of the bankruptcy case, I affirmatively pursued the potential of selling the Debtor's assets or entering into various other business arrangements such as joint venture opportunities, investment in the Debtor and with both strategic and financial potential investors (the "Other Opportunities").

10.     All of the Other Opportunities discussed by potential buyers or investors were significantly below the Purchase Price being offered by Buyer. Indeed, due to the lack of any realistic opportunities, Debtor proposed to sell its autoclave, tooling, and mast spinners, which was a substantial part of the business, to Rigpro, LLC which would have yielded less than 1/3rd of the Purchase Price

being offered by the Buyer.

11.    I believe that any further marketing of the Debtor's assets will not yield a higher or better offer than that being made by the Buyer.  Indeed, in my business judgement further marketing of the Assets would likely harm the Debtor by, among other things, putting at risk the current customer contracts and putting the current APA at risk, especially since Buyer's purchase price is premised upon the Debtor's ability to quickly close the transaction.

12.    The Sale of the Assets maximizes the value to the bankruptcy estate, relieve the estate of substantial obligations relating to such assets, ensure a pathway to a confirmable plan and avoid the further deterioration in the value of the Assets.

13.    The APA with the Buyer represents the highest and best price for the Assets.  Indeed, the proposed sale contemplates a purchase price sufficient to satisfy all undisputed secured claims, administrative claims, and priority claims of the Debtor's bankruptcy estate, while, at the same time, ensuring a distribution to unsecured creditors that is no less than the proposed distribution in the Plan of Reorganization of Offshore Spars Co. and Eric R. Graczyk.  The material benefit to all parties includes the removal of any uncertainty of the Debtor's continued operations and prompt payment in an amount that was already met with near universal support by the creditor base.

14.    Prior to the Buyer approaching me, neither the Debtor nor I had any

relationship with the Buyer. The proposed sale is the product of extensive arms-length negotiation between the parties.

15.    I believe that pursuing the Sale is the course of action most likely to maximize the value of the Assets. As a result, and in an exercise of my fiduciary obligations to the bankruptcy estate, I have determined to execute the APA and to seek authority of the Court to approve the same via the Motion.

16.    I have made this determination not just with an eye towards the monetary consideration provided, which is substantial, but also with the well-being of the Debtor's customers, employees, and viability in the marketplace.

17.    I believe that the Buyer has the financial ability to close on the Sale, is familiar with the Debtor and its business, and will provide a substantial boost to the Debtor's customers and market presence.

18.    The APA has an employment agreement attached to it pursuant to which I would be employed by the Buyer upon Closing. The material aspects of the APA; however, including the purchase price for the Assets was negotiated prior to terms of my employment.   The employment agreement supports my ability to propose a feasible plan of reorganization in my individual bankruptcy case.

19.    Either through counsel or on my own accord, I have ensured that constituents to the bankruptcy cases are well-informed of the Sale.  By way of example, I have been engaged in regular conversations with the Subchapter V

Trustee, who I understood fully supports the Sale and my marketing efforts of the Debtor's business in this unique marketspace.

20.     I also note that the profit margin for the Debtor is slim and feasibility of the ongoing operations of the Debtor are uncertain.

## Conclusion

21.     I have read, reviewed, and approved the Motion and the Asset Purchase Agreement.

22.     I request that parties approve the APA and Sale as it will provide the best outcome for the entirety of the bankruptcy estate.

Pursuant to 28 U.S.C. § 1746, I declare to the best of my knowledge, under penalty of perjury, that the above statements are true and correct.

**OFFSHORE SPARS CO.**

By: /s/ Eric R. Graczyk
Eric R. Graczyk
Its:     Responsible Person

Dated:  November 3, 2023

# EXHIBIT 6A
(Asset Purchase Agreement)

DocuSign Envelope ID: D2E29CB8-D025-4496-A6E0-3E9B42112047

**Asset Purchase Agreement**

**By and Between**

**Offshore Acquisition, LLC (Buyer) and**

**Offshore Spars Co (Seller)**

**and**

**Eric R. Graczyk**

4867-0337-8317.2

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "**Agreement**") is made as of November 2, 2023 (the "**Execution Date**"), by and among Offshore Acquisition, LLC, a Michigan limited liability company ("**Buyer**") and Offshore Spars Co. ("**Offshore**" or "**Seller**"), a Michigan corporation, and Eric R. Graczyk ("**Graczyk**"). Buyer, Seller, and Graczyk are referred to from time to time in this Agreement individually as, a "**Party**", and collectively as, the "**Parties**".

Recitals

WHEREAS, Seller is engaged in the business of designing and manufacturing carbon fiber and composite products, including for the boat building, aerospace, and automotive industries (the "**Business**").

WHEREAS, on May 23, 2023, Seller and Graczyk (collectively "**Debtors**") each sought relief under Chapter 11 of the Bankruptcy Code. The Debtors' bankruptcy cases are currently pending before the United States Bankruptcy Court for the Eastern District of Michigan, Southern Division (the "**Bankruptcy Court**") entitled as In re Offshore Spars Co., Case No. 23-44657 and In re Eric R. Graczyk, Case No. 23-44658, and which are being jointly administered (collectively the "**Bankruptcy Cases**").

WHEREAS, Seller currently operates its Business at a location identified as 50200 E. Russell Schmidt Blvd, New Baltimore, MI 48051 (the "**Facility**") pursuant to that certain Lease Agreement dated as of April 21, 2015, by and between Seller and Chesterfield 5, LLC (the "**Facility Lease**"), which, at Buyer's discretion and direction, may be assumed and assigned or rejected by Seller.

WHEREAS, Debtors in each of their business judgment believes a sale of the Business to be in the best interests of the bankruptcy estates with respect to the Bankruptcy Cases and all creditors and parties in interest in the Bankruptcy Cases.

WHEREAS, Buyer desires to acquire substantially all the assets owned by Seller and Seller's operation at the Facility used in the operation of the Business on the terms and conditions contained in this Agreement, with this Agreement subject to Bankruptcy Court approval and a final Sale Order entered acceptable to Buyer in its sole discretion providing, among other things for the sale of Seller's assets free and clear of all interests, liens, claims and encumbrances and the assumption and assignment of certain contracts and leases pursuant to the Bankruptcy Code.

NOW, THEREFORE, for good and valuable consideration, the sufficiency and receipt of which is hereby acknowledged, the Parties hereby agree as follows.

# ARTICLE 1
# DEFINITIONS

As used herein, the following terms have the meanings set forth below.

(a)     "**Acceptable Environmental Reports**" means any reports of such inspections, investigations, surveys and tests as may be ordered by Buyer to determine whether any Environmental Defects exist at, on, in, under, around or affecting the Facility and which investigative reports are acceptable to Buyer in its sole discretion.

(b)     "**Accounts Receivable**" means uncollected accounts receivable for services and goods rendered by Seller, notes receivable, employee advances receivable, negotiable instruments, and chattel paper

(c)     "**Action**" means any action, claim, proceeding, litigation, arbitration, mediation, suit, investigation or regulatory inquiry (whether civil, criminal, administrative or judicial), or any appeal therefrom or any material demand letter threatening the initiation of any of the foregoing.

(d)     "**Allocation Schedule**" has the meaning set forth in <u>Section 2.7</u>.

(e)     "**Applicable Law**" means all applicable laws, statutes, regulations, rules, ordinances, codes, licenses, permits and orders, from time to time in existence, of all courts of competent jurisdiction and Governmental Authorities, and all applicable judicial and administrative and regulatory decrees, judgments and orders, including common law rulings and determinations of any kind, including those relating to (i) damage to, or the protection of real or personal property, (ii) human health and safety (except those requirements which, by definition, are solely the responsibility of employers), (iii) Environmental Laws, (iv) accessibility for the disabled or handicapped, including any applicable provisions of The Architectural Barriers Act of 1968, The Rehabilitation Act of 1973, The Fair Housing Act of 1988, The Americans With Disabilities Act, the accessibility code(s), if any, of the State in which the Facility is located, and (v) any laws applicable to the Facility and all regulations and guidelines lawfully promulgated under any of the foregoing, as the same may be amended from time to time.

(f)     "**Assumed Contracts**" has the meaning set forth in <u>Section 5.7(b).</u>

(g)     "**Assumed Liabilities**" has the meaning set forth in <u>Section 2.3</u>.

(h)     "**Avoidance Actions**" means Causes of Action arising under sections 502, 510, 541, 542, 543, 544, 545, 547 through 551, or 553 of the Bankruptcy Code, or under similar or related state or federal statutes and common law, including fraudulent transfer laws, whether or not litigation is commenced to prosecute such Causes of Action, and which may be recovered pursuant to section 550 of the Bankruptcy Code.

(i)     "**Bankruptcy Cases**" has the meaning set forth in the recitals.

(j)     "**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy", as now and hereafter in effect, or any successor statute.

3

(k)  "**Bankruptcy Court**" has the meaning set forth in the recitals.

(l)  "**Books and Records**" means all books and records, including books of account, ledgers and general, financial and accounting records, machinery and equipment maintenance files, customer lists, customer purchasing histories, price lists, distribution lists, supplier lists, production data, quality control records and procedures, customer complaints and inquiry files, records and data (including all correspondence with any Governmental Authority other than taxing authorities), sales material and records (including pricing history, total sales, terms and conditions of sale, sales and pricing policies and practices), strategic plans, internal financial statements, marketing and promotional surveys, material and research and intellectual property files, and the telephone and facsimile numbers

(m)  "**Business**" has the meaning set forth in the recitals.

(n)  "**Business Day**" means any day other than any Saturday, Sunday or legal holiday with the Bankruptcy Court.

(o)  "**Cash on Hand**" has the meaning set forth in Section 2.2(a).

(p)  "**Casualty**" has the meaning set forth in Section 2.8(b).

(q)  "**Claim**" has the meaning set forth in Section 101(5) of the Bankruptcy Code.

(r)  "**Closing**" has the meaning set forth in Section 2.6.

(s)  "**Closing Date**" has the meaning set forth in Section 2.6.

(t)  "**Contract**" means agreements, contracts, commitments, personal property leases, real property leases, and other arrangements to which Seller is a party.

(u)  "**Contract Party**" has the meaning set forth in Section 5.7(a).

(v)  "**Control**" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of a Person, whether through the ownership of voting securities, by contract or credit arrangement, as trustee or executor, or otherwise.

(w)  "**Cure Amounts**" means the amount necessary pursuant to 11 U.S.C. Section 365 to cure defaults under Assumed Contracts as agreed to by Buyer and determined to be currently due and owing by the Bankruptcy Court prior to Closing.

(x)  "**Effective Time**" has the meaning set forth in Section 2.6.

(y)  "**Environmental Defect**" means any condition of, in, on, under, about or affecting any of the Facility that either (i) requires monitoring, reporting, removal, restoration, remediation or resolution under applicable Environmental Laws; (ii) if known by a federal or state regulatory agency of competent jurisdiction, would reasonably be expected to cause such federal

4

or state regulatory agency to assert that the Facility require monitoring, reporting, removal, restoration, remediation or resolution under applicable Environmental Laws; or (iii) creates any liabilities or obligations under Environmental Laws

(z)     "**Environmental Laws**" means any federal, state, or local Applicable Law relating to the prevention of pollution, protection of health or the environment or natural resources, restoration of environmental quality, or releases of or exposure to Hazardous Materials or the handling, generation, treatment, transportation, storage, use, arrangement for disposal or disposal, manufacture, distribution, formulation, packaging or labeling of Hazardous Materials, including the following federal statutes and the regulations promulgated thereunder: the Comprehensive Environmental Response, Compensation and Liability Act of 1980; the Emergency Planning and Community Right-To-Know Act; the Resources Conservation and Recovery Act; the Clean Air Act; the Clean Water Act; the Safe Drinking Water Act; the Oil Pollution Act; the Toxic Substances Control Act; the Hazardous Materials Transportation Act; the Federal Insecticide, Fungicide, and Rodenticide Act; and the regulations promulgated pursuant thereto and analogous State and local Applicable Laws.

(aa)     "**Equipment**" means the equipment owned by Seller and used in the Business, including furniture, fixtures, equipment (including office and phone system equipment owned by Seller, if any), machinery, parts, computer hardware, tools, dies, jigs, assembly boards, patterns, molds and all other tangible personal property (other than the Inventory) and including the equipment identified on Schedule 1(aa).

(bb)     "**Excluded Assets**" has the meaning set forth in Section 2.2.

(cc)     "**Excluded Contract**" mean any contract of Seller that is not an Assumed Contract.

(dd)     "**Facility**" has the meaning set forth in the recitals.

(ee)     "**Facility Lease**" has the meaning set forth in the recitals.

(ff)     "**Governmental Authority**" means the Bankruptcy Court, any court, tribunal, arbitrator, authority, agency, commission, official or other instrumentality of the United States, any foreign country or any domestic or foreign state, county, city or other political subdivision or any arbitral body.

(gg)     "**Hazardous Material(s)**" means asbestos, petroleum, polychlorinated biphenyl and any other materials defined as a hazardous substance, hazardous waste, hazardous constituents or solid waste in (i) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §9601 et seq., as amended by Superfund Amendments and Reauthorization Act of 1986 (Pub. L. 99-499 100 Stat. 1613), and any amendments thereto and regulations thereunder, (ii) the Resource Conservation and Recovery Act, 42 U.S.C. §6901 et seq., and any amendments thereto and regulations thereunder, (iii) Section 311 of the Federal Water Pollution Control Act, 33 U.S.C. §1251 et seq. (33 U.S.C. §1321), (iv) the Hazardous Materials Transportation Act (49 U.S.C. § 1801 et seq.), (v) the Toxic Substance Control Act (15 U.S.C. § 2601 et seq.), (vi) the Federal Insecticide, Fungicide and Rodenticide Control Act (7 U.S.C. § 136 et seq.), (vii) the Occupational Safety and Health Act of 1970 (29 U.S.C. § 651 et seq.), (viii)

the Emergency Planning and Community Right to Know Act of 1986 (42 U.S.C. § 11001 et seq.), (ix) the Hazardous and Solid Waste Amendments of 1984 (Public Law 86-616 Nov. 9, 1984), (x) the Federal Clean Air Act (42 U.S.C. § 7401 et seq.), and in the regulations promulgated pursuant to such laws, all as amended, (xi) the Carpenter-Presley-Tanner Hazardous Substance Account Act (HLTH & S § 25300 et seq.), (xii) the Hazardous Waste Control Law (HLTH & S § 25100 et seq.), and (xiii) any federal, state or local law, statute, ordinance or regulation.

(hh)     "**Indebtedness**" means any obligations of Seller outstanding as of the Closing:

(i)     for indebtedness for borrowed money;

(ii)     for indebtedness for accounts payable that are overdue beyond ninety days following the required payment terms;

(iii)     under any letter of credit;

(iv)     under any interest rate swap or hedge Contract, and any costs associated with termination of any such arrangement;

(v)     with respect to capitalized lease obligations;

(vi)     under purchase money financing arrangements;

(vii)     secured by a Lien on the Purchased Assets;

(viii)     with respect to amounts owed with respect to any prior acquisitions of Seller (including any contingent payments with respect thereto);

(ix)     related to deferred compensation arrangements, severance payments, obligations to pay accrued bonuses, profit sharing obligations or commissions owed to any current or former employee, and stay, success or other bonuses related to the transactions contemplated herein;

(x)     for the employer's share of any payroll Taxes due in connection with the obligations of the type referred to in clause (ix);

(xi)     with respect to unpaid dividends or distributions;

(xii)     for any interest, fees, penalties, or other payments relating to any of the foregoing;

(xiii)     for any loan, grant or assistance provided by any Governmental Authority, whether or not Seller is required to pay back such loan, grant or assistance or such loan, grant or assistance is eligible for forgiveness, including any amounts remaining outstanding under loans issued to or made available to Seller under the Paycheck Protection Program; and

(xiv)     all guarantees by Seller of obligations of the type referred to above.

6

(ii)     "**Inventory**" means all inventory of any kind or nature, including raw materials, work in process, finished goods, service parts and supplies whether or not prepaid, including all such items located at the Business.

(jj)     "**Liabilities**" means any Indebtedness, Claims, Liens, damages, lawsuits, liabilities, obligations, losses, fines or other penalties, royalties, Actions, proceedings, deficiencies, duties, obligations, contracts, agreements, debts, obligations, interests or other liabilities, whether statutory, regulatory or judicially created, including warranties or other Business commitments, representations or promises (whether absolute, accrued, contingent, fixed, liquidated or unliquidated, or otherwise, or whether known or unknown, or whether due or to become due, and whether in contract, tort, strict liability or otherwise, and whether or not resulting from third-party claims).

(kk)     "**Lien**" means any security interest, pledge, mortgage, lien, charge, adverse claim of ownership or use, restriction on transfer (such as a right of first refusal or other similar right), defect of title, encroachments, or other encumbrance of any kind or character.

(ll)     "**Material Adverse Effect**" means any circumstance, event, effect or change that, individually or in the aggregate, is or would reasonably be expected to be materially adverse to (i) the Business, or the results of operations, or condition (financial or otherwise) of the Facility, taken as a whole, (ii) the Purchased Assets; or (iii) the ability of Seller to perform its obligations under this Agreement or to consummate the transactions contemplated under this Agreement; provided, that no circumstance, event, effect or change arising out of any of the following shall be deemed, either alone or in combination, to constitute or contribute to a Material Adverse Effect: (A) any condition, change, effect, or circumstance generally affecting any of the industries or markets in which Seller operates; (B) any change in any law or generally accepted accounting principles (or changes in interpretations of any law or generally accepted accounting principles); (C) general economic, regulatory, or political conditions (or changes therein) or conditions (or changes therein) in the financial, credit, or securities markets; (D) any acts of God, natural disasters, terrorism, armed hostilities, sabotage, war, or any escalation or worsening of any of the foregoing; (E) the negotiation, execution, announcement, consummation, or existence of this Agreement or the transactions contemplated hereby (including the threatened or actual impact on relationships of Seller with customers, vendors, suppliers, distributors, landlords or employees (including the threatened or actual termination, suspension, modification or reduction of such relationships)); (F) any action required or permitted to be taken pursuant to the terms of this Agreement or upon the mutual written consent of the Parties; (G) actions or effects caused by or under the responsibility of Buyer; (H) failure by Seller to meet any projections, forecasts, or other pro forma financial information; and (I) any litigation or claim threatened or initiated by creditors of Seller against Seller or any of its officers or directors, in each case, arising out of the execution of this Agreement or the transactions contemplated hereby; except in the circumstances contemplated by clauses (A), (B), and (D) above, to the extent any such condition, change, effect, or circumstance has a material and disproportionate adverse effect on Seller relative to other similarly situated participants in the industries and markets in which Seller operates.

(mm)     "**Modified Lease**" has the meaning set forth in Section 6.2.(h).

7

(nn)     "**Modified Lease Approval Order**" has the meaning set forth in Section 6.2.(h)

(oo)     "**Outside Closing Date**" has the meaning set forth in <u>Section 2.6</u>.

(pp)     "**Permits**" means to the extent transferrable, all licenses, permits (including occupancy permits), certificates, registrations, approvals, franchises, consents and other authorizations of Seller obtained from or filed with a Governmental Authority and required or used in connection with the Business.

(qq)     "**Person**" means any natural person, corporation, limited liability company, general partnership, limited partnership, sole proprietorship, trust, union, association, Governmental Authority or other business organization.

(rr)     "**Purchase Price**" has the meaning set forth in <u>Section 2.5(a)</u>.

(ss)     "**Purchased Assets**" has the meaning set forth in <u>Section 2.1</u>.

(tt)     "**Rejected Contracts**" has the meaning set forth in <u>Section 5.7(b)</u>.

(uu)     "**Related Agreements**" means, collectively (i) a Bill of Sale if requested by Buyer in form and substance agreed to by Buyer, (ii) an Assignment and Assumption Agreement, (iii) an employment contract by and between Buyer and Graczyk; (iv) the executed Modified Lease, and (vi) any other agreements, documents, and instruments related to the transactions contemplated herein.

(vv)     "**Related Person**" means, with respect to a specific Person, any officer, director, member, manager, employee, agent, shareholder, representative, successor or assign of such Person.

(ww)     "**Retained Liabilities**" has the meaning set forth in <u>Section 2.4</u>.

(xx)     "**Sale Order**" means a final non-appealed or appealable order, in the form attached hereto as <u>Schedule 2.6</u> or as otherwise approved by Buyer, and entered by the Bankruptcy Court in the Bankruptcy Cases approving the consummation of the transactions contemplated in this Agreement pursuant to Sections 363 and 365 of the Bankruptcy Code.

(yy)     "**Seller's Knowledge**" shall mean the actual knowledge of Graczyk after reasonable inquiry.

(zz)     "**Seller Warranties**" has the meaning set forth in <u>Section 2.2 (j)</u>

(aaa)     "**Tax**" and "**Taxes**" means any and all taxes, fees, levies, duties, tariffs, import charges and other charges imposed by any taxing authority, together with any related interest, penalties or other additions thereto, or additional amounts imposed by any taxing authority, and without limiting the generality of the foregoing, shall include net income alternative or add-on minimum tax, gross income, gross receipts, sales, use, ad valorem, value added, franchise, profits, license, transfer, recording, escheat, withholding, payroll, employment, excise,

8

severance, stamp, occupation, premium, property, windfall profit, environmental, custom, duty, or other tax, governmental fee or other like assessment or charge of any kind whatsoever.

(bbb)  "**Termination Date**" has the meaning set forth in <u>Section 5.6</u>.

(ccc)  "**Threshold**" has the meaning set forth in <u>Section 2.8(b)</u>.

(ddd)  "**Transfer Taxes**" means all transfer, documentary, sales, use, stamp, registration, value added and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement (including any property transfer Tax and any other similar Tax).

## ARTICLE 2
## PURCHASE AND SALE OF ASSETS

**2.1    Sale of Assets to Buyer.**  Upon the terms and subject to the conditions contained in this Agreement, at the Closing, Seller shall sell, assign, transfer, deliver and convey to Buyer, and Buyer shall purchase, acquire and accept from Seller pursuant to Sections 363 and 365 of the Bankruptcy Code, all of Seller's right, title and interest in and to all tangible and intangible assets, properties, furniture, fixtures, equipment, instruments, supplies, inventory, vehicles, artwork, leasehold improvements, phone systems, computer hardware, databases, machinery, tools (and related repair and maintenance records), goodwill, rights, titles and interests of every kind and nature of Seller which are owned by Seller and used in the Business, free and clear of all Liabilities except the Assumed Liabilities, including the following (collectively, the "**Purchased Assets**"):

(a)    the Accounts Receivable;

(b)    the Books and Records;

(c)    the Assumed Contracts;

(d)    the Equipment;

(e)    the Inventory;

(f)    to the extent transferable, all Permits;

(g)    all registered and unregistered intellectual property owned or licensed (as licensor or licensee) by Seller that is used in or necessary for the conduct of the Business (including Seller's goodwill in such intellectual property), including all trademarks, service marks, logos, and brands and related applications (including the right and license to use the name "Offshore Spars" and any other names used by Seller); patents and patent applications; drawings, specifications, designs or models; know-how, unpatented inventions, trade secrets, secret formulas and processes; copyrights and works of authorship, whether or not copyrightable; trade secrets; software; and internet web sites,  social media usernames, internet domain names, and URLs.

(h)    all assignable or transferable goodwill relating to or arising in connection with the ownership or operation of the Business;

9

DocuSign Envelope ID: D2E29CB8-D025-4496-A6E0-3E9B42112047

(i)     all prospect lists (including all books, records and other materials, in hard copy and electronic format, that are in the possession of any Person that performs marketing services on behalf of Seller), marketing information, computer software and software licenses, telephone and fax numbers, telephone listings, email addresses and domain names used by the Business;

(j)     all transferable third-party warranties and Seller rights to claims for warranties relating to the Purchased Assets, together with the obligations and Liabilities related thereto (collectively, the "**Seller Warranties**");

(k)     all claims, rights and rebates (and benefits arising therefrom) with, against or owing from all third Persons whomsoever, including all rights against suppliers under warranties covering any of the Inventory or Equipment and all rights against suppliers with respect to rebates, discounts, and allowances (including refunds and credits) to the extent they are legally transferable by Seller;

(l)     all rights in connection with deposits made, and prepaid expenses paid, by Seller;

(m)     all Tax refunds, rebates, payments for past due obligations, and refunds of overpayments which are related to Seller's operation of the Business prior to the Closing;

(n)     all other assets of Seller relating to or used in connection with the Business that are not Excluded Assets;

(o)     The 2022 Ford Explorer (VIN 1FM5K8GC1NGC20904);

(p)     general intangibles, and community specific intellectual property, if assignable under Applicable Law; and

(q)     Claims and causes of action of Seller including Avoidance Actions.

**2.2     Excluded Assets.**  Notwithstanding Section 2.1, the Parties acknowledge that Seller shall not sell, assign, transfer or convey to Buyer, and Buyer shall not purchase, acquire or accept from Seller, the Excluded Assets (all such assets, the "**Excluded Assets**") consisting of the following:

(a)     All cash on hand as of the Closing Date other than funds in the Seller's professional fee escrow account not to exceed $52,500.00 (the "**Cash on Hand**");

(b)     To the extent remaining as of the Closing Date, Seller Claims against Steven King and defenses to Claims by Steven King.

(c)     all set-off rights to Claims filed or asserted in the Bankruptcy Cases (except to the extent arising in connection with an Assumed Contract);

(d)     hold-backs and escrows for any prorations or Taxes being paid by Seller in connection with the Closing or afterward;

10

(e)    all (i) original Tax, accounting and financial records which pertain exclusively to the Excluded Assets, and (iii) such other files, books and records which pertain exclusively to the Excluded Assets or to the formation, existence or capitalization of Seller or of any other Person;

(f)    all Inventory and assets of the Business disposed of or exhausted prior to Closing in the ordinary course of business;

(g)    any records which Seller is legally required to retain in its possession and any records related to Excluded Assets or Retained Liabilities (as hereinafter defined);

(h)    all equipment and tangible property located at the Business but not owned by Seller, and all other assets, properties and rights not related to or used in the Business, except for any equipment or personal property leased by Seller under any Assumed Contract;

(i)    Seller's attorney-client and work-product privileges.

(j)    Seller Liabilities of any kind or nature associated with the business operations that do not arise under Assumed Contracts.

**2.3**    **Assumed Liabilities.**  Upon the terms and subject to the conditions contained in this Agreement, at the Closing, Buyer shall assume or otherwise be responsible, which amounts shall be in addition to the Purchase Price, for (collectively, the "**Assumed Liabilities**"):

(a)    all Liabilities under the Purchased Assets accruing or arising after the Closing;

(b)    all Liabilities associated with the Assumed Contracts from and after Closing, including all Cure Amounts associated therewith (which Cure Amounts shall be a bar to any pre-existing liabilities);

(c)    all Liabilities required to be paid by Buyer pursuant to this Agreement (including stamp and recording Taxes).

**2.4**    **Retained Liabilities.** Other than the Assumed Liabilities, Buyer shall not assume from Seller, and will not be responsible for or otherwise bear the economic burden of, any claims against or Liabilities or obligations of Seller, whether accrued, matured, unmatured, absolute or contingent, whether known or unknown, whether due or to become due and regardless of when asserted (all such claims and liabilities (the "**Retained Liabilities**"), all of which shall be retained by Seller, including:

(a)    malpractice, professional liability or other tort claims, statutory or regulatory claims, claims of local, state or federal agencies whether civil or criminal, fraud-based claims or claims for breach of contract to the extent any such claims are based on acts or omissions of Seller or events occurring at the Facility before the Effective Time;

(b)    any accounts payable, taxes, or other obligation or Liabilities of Seller to pay money incurred by Seller for periods prior to the Effective Time;

11

(c) any collective bargaining agreements or other agreements or understandings with any labor union or collective bargaining unit or any employment or consulting agreements of any kind and any Liabilities arising from any pension fund or benefits programs;

(d) any claims by any current or former employees, contractors or other third parties related to acts or omissions of Seller;

(e) any administrative expense Claims accruing in the Bankruptcy Cases;

(f) Liabilities of Seller arising under or in connection with any Excluded Contract;

(g) Liabilities of Seller arising under all employment and change of control contracts, severance obligations, equity option contracts and equity purchase contracts to which Seller is a party other than any Liability arising pursuant to any Assumed Contract;

(h) Liabilities or obligations in connection with any Indebtedness of Seller, except pursuant to any Assumed Contract or other Assumed Liability;

(i) other than Cure Amounts related to the Assumed Contracts, all pre-petition and post-petition Liabilities as of the Closing Date, including all trade payables and general unsecured Claims;

(j) any Liability arising out of, under or in connection with the Excluded Assets;

(k) any Liabilities for salaries, wages, bonus, sales commission, severance, vacation and sick pay, profit sharing obligations, health insurance continuation (including COBRA) and other compensation or benefits which are owed to current or former employees, contractors or representatives of Seller as of the Closing Date for work performed prior to the Closing Date (whether or not such employees or representatives become employees or representatives of Buyer on the Closing Date) or any other liability or obligation to any of Seller's current or former employees, contractors or representatives with respect to their employment or relationship on or prior to the Closing Date, including any liabilities for medical, dental and disability (both long-term and short-term) benefits, whether insured or self-insured, accruing or based upon exposure to conditions or aggravation of disabilities or conditions in existence on or prior to the Closing Date or for claims incurred or disabilities commencing on or prior to the Closing Date;

(l) all Liabilities relating to (including amounts or notice due to) employees, former employees, consultants, former consultants or retirees of Seller based on the termination of such employment or engagement by Seller, including any amounts due to such Persons prior to Closing;

(m) any Liabilities and obligations in connection with any employee benefit plan, practice, program, policy, agreement or arrangement that is maintained, sponsored or contributed to (or formerly maintained, sponsored or contributed to), or required to be contributed to, by Seller;

12

(n)  Liabilities, asserted or unasserted, arising out of or in connection with damage to or destruction of property or death of or injury to persons or involving products manufactured or sold by Seller or the Business or services performed by Seller or the Business on or prior to the Closing Date;

(o)  any Liabilities for Taxes; and

(p)  any Liability that is not an Assumed Liability.

**2.5  Closing Proceedings.**

(a)  The aggregate Purchase Price under this Agreement is $2,430,000.00 ("**Purchase Price**") minus the Cash on Hand.

(b)  At the Closing, in addition to such other actions as may be provided for herein, Buyer shall pay to Seller, in cash, an amount equal to the Purchase Price.

(c)  At the Closing, Buyer shall assume the Assumed Liabilities (which shall be in addition to, and not a credit against, the Purchase Price), and with regard to Assumed Contracts, shall pay to each Assumed Contract party any Cure Amounts, in cash, by wire transfer of immediately available funds, necessary to acquire any Assumed Contract, at such time as may be designated by the Bankruptcy Court in the Sale Order.

(d)  At the Closing, the Parties will execute and deliver the Related Agreements.

**2.6  Time and Place of Closing.**  Subject to the terms of this Agreement, the closing of the transactions contemplated hereby (the "**Closing**") shall take place on the occurrence of the latest of the following: (i) the fifth Business Day after entry of the Sale Order; (ii) Buyer receiving Acceptable Environmental Reports, and (iii) January 12, 2024 (the "**Outside Closing Date**") (clauses (i), (ii) and (iii) being collectively the "**Closing Date**"), unless otherwise mutually agreed by the Parties. The transactions contemplated hereby shall take place pursuant to, and in accordance with, the terms and conditions hereof.  The Closing shall be effective as of 11:59 p.m. on the Closing Date or such other date and time as the Parties may agree upon in writing (the "**Effective Time**").

**2.7  Purchase Price Allocation.**  Buyer and Seller shall allocate the Purchase Price (together with Assumed Liabilities properly included, if any) among the Purchased Assets in accordance with Schedule 2.7 (the "**Allocation Schedule**"), which shall be prepared in a manner consistent with Section 1060 of the Internal Revenue Code and the Treasury Regulations thereunder, provided however that such allocation shall not be binding on any party for any purpose other than for Tax purposes.  Seller and Buyer agree to file their respective IRS Forms 8594 and all federal, state and local Tax returns in accordance with the Allocation Schedule.

**2.8  Risk of Loss.**

In the event that all or any material part of the Purchased Assets are damaged or destroyed by fire, windstorm or any other casualty ("Casualty") on or prior to the Closing, Seller shall promptly notify Buyer in writing of such damage or destruction.  In the event that such

13

damage or destruction is in the aggregate more than $100,000.00 (the "Threshold"), Buyer shall have the option to: (i) terminate this Agreement by written notice delivered to Seller within ten Business Days after Buyer's receipt of notice of such damage or destruction and the Parties shall have no further obligations hereunder, or (ii) proceed with the transaction contemplated in this Agreement without abatement of the Purchase Price, in which case (A) all insurance proceeds relating to such damage or casualty shall be deemed to be absolutely and irrevocably assigned to and be payable directly to Buyer, except for those attributable to remedial actions taken by Seller with respect to such damage or casualty prior to the Effective Time, (B) after the Closing, Buyer shall have the right to conduct all settlement proceedings with respect to such insurance claims, and (C) Seller shall deliver to Buyer an unconditional assignment of all such insurance proceeds. If Buyer proceeds with this Agreement after a Casualty, Seller shall provide Buyer with all necessary and reasonable access to the Facility in order to assess any damage or destruction.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES OF SELLER

In order to induce Buyer to enter into this Agreement, Seller makes the representations and warranties set forth below which are true, correct and complete on the Execution Date and shall be true, correct and complete as of the Closing.

**3.1** **Organization.** Subject to entry of the Sale Order, Seller has full power, authority and capacity to execute and deliver this Agreement and the Related Agreements and to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.

**3.2** **Execution and Delivery.** Subject to entry of the Sale Order, this Agreement has been duly and validly executed and delivered by Seller and constitutes, and upon the execution and delivery by Seller of the Related Agreements, the Related Agreements shall constitute, legal, valid and binding obligations of Seller enforceable against Seller in accordance with their terms.

**3.3** **Permits.** To Seller's Knowledge, Seller has all Permits which are needed or required by Applicable Law to operate its Business. No contracts to which Seller is party, and no business relationships between Seller and any customer of Seller, require Seller to be qualified as a minority-, woman-, or veteran-owned business, a "small business" or any other similar qualification or classification (in each case under any legal, industry or customer standards or definitions).

**3.4** **Litigation Proceedings; Judgments.** Except for the Bankruptcy Cases, there are Actions pending or, to Seller's Knowledge, threatened against or related to Seller, the Business or the Purchased Assets, at law or in equity or otherwise. Except for the "Bankruptcy Cases", there are no judgments presently outstanding and unsatisfied against the Business, Seller or any of the Purchased Assets. Seller has not received any written notice or written claim for tort or violation of any applicable order, or an investigation thereof with respect to its ownership or operation of the Facility or the Business.

**3.5** **Employee Relations.** To Seller's Knowledge, Seller is complying in all material respects with all Applicable Laws and contracts respecting employment and employment

14

practices, labor relations, terms and conditions of employment, and wages and hours. To Seller's Knowledge there are no material actions, suits or legal, administrative, arbitration or other proceedings or governmental investigations pending or threatened against Seller in respect of, any unemployment or workers' compensation benefits or wrongful discharge, sexual harassment, employment discrimination, unfair labor practices or other violation of any applicable federal, state or local employment law. There are pending or, to Seller's Knowledge, threatened Actions before or claims by a Governmental Authority regarding employment discrimination, unfair labor practices, safety or other employment-related charges or complaints, wage and hour claims, unemployment compensation claims, workers' compensation claims or the like. Seller is not a party to and is not otherwise bound by any labor agreement, collective bargaining agreement, or other similar contract.

3.6    **Multi-Employer Plans.**  Seller has not, nor is it required to, contribute (and has not ever contributed or been required to contribute) to any multi-employer plan, as defined in Section 3(37) of the Employee Retirement Income Security Act of 1974, as amended.

3.7    **Compliance.**  To Seller's Knowledge, to the extent applicable, Seller is complying in all material respects with all applicable statutes, rules, regulations, and requirements of each Governmental Authority having jurisdiction over Seller, the Business, and the Purchased Assets.

3.8    **Regulatory and Legal Compliance.**  To Seller's Knowledge, Seller has not received any written notice from any Governmental Authority of any alleged violation or noncompliance that has not been cured or addressed by a plan of corrective action, or which, if adversely determined, would not reasonably be expected to have a Material Adverse Effect.

3.9    **Prohibited Practices.** During the eighteen month period prior to the Execution Date, no officers or directors of Seller have, during their period of engagement with Seller, been charged with, convicted of or pleaded guilty to crimes of theft or dishonesty, financial misconduct, or offenses. To Seller's Knowledge, during the eighteen month period prior to the Execution Date, none of Seller's officers, directors or employees has engaged in any conduct that may result in sanctions to Seller under any federal or state laws.

3.10    **Government Investigations.**  During the eighteen month period prior to the Closing Date, Seller has received no written notice of the commencement of any investigation proceedings or any governmental investigation or Action (including any civil investigative demand or subpoena).

3.11    **Broker.** Seller has not incurred any liability for any fee or commission to any broker, finder, investment banker or other intermediary in connection with the transactions contemplated by this Agreement that would result in any liability, fee, expense or obligation being imposed on Buyer.

3.12    **Environmental Matters.**   (a) to Seller's Knowledge, there are no material environmental liabilities on or affecting any of the Facility, (b) to Seller's Knowledge, Seller has at all times operated the Facility and conducted the Business and, during the period that Seller owned the Facility and any third party operated any such Business, such third party operated the Business, in each case, in compliance with all applicable Environmental Laws and all Permits

15

required thereunder or issued pursuant thereto; (c) there are no Actions pending or to Seller's Knowledge threatened before any Governmental Authority operation of the Facility alleging violations of Environmental Laws, or claiming material remediation obligations under applicable Environmental Laws, and Seller has not received any written notice of any alleged or actual violation or non-compliance with any Environmental Law or of non-compliance with the terms or conditions of any environmental Permits, arising from, based upon, associated with or related to the Facility and (d) to the extent in Seller's possession or control, Seller has provided Buyer access to accurate and complete copies of all final written environmental reports, studies and notices in Seller's possession prepared by any third party on behalf of, or delivered by a Governmental Authority to, Seller with respect to the Real Property, that identify or allege any Environmental Defect on or affecting the Real Property.

**3.13** [Intentionally omitted]

**3.14** **Insurance.** Schedule 3.14 sets forth an accurate and complete list of all insurance policies or self-insurance funds maintained by Seller or its representatives or agents with respect to the Business and Seller as of the Execution Date covering the ownership and operation of the Business, indicating the types of insurance, policy numbers, terms, identity of insurers and amounts and coverages (including applicable deductibles*).*

**3.15** **Intellectual Property.** Seller owns or has the right to use all intellectual property used in connection with the ownership or operation of the Business. The conduct of the Business does not infringe or otherwise violate any intellectual property or other proprietary rights of any other Person, and there is no action pending or, to Seller's Knowledge, threatened, alleging any such infringement or violation or challenging Seller's rights in or to any of its intellectual property.

**3.16** **Tax Matters.** Except as set forth on Schedule 3.16:

(a) [Intentionally omitted]

(b) There are no liens relating to Taxes on any of the Purchased Assets other than liens for Taxes not yet due and payable.

(c) To Seller's Knowledge, proper and accurate amounts have been withheld by Seller in compliance with the payroll tax and other withholding provisions of all Applicable Laws, and all such amounts have been remitted to the proper taxing authority.

(d) Seller has filed all tax returns required to be filed by it, including all tax returns relating to the Purchased Assets (all of which are true, complete and correct in all material respects). Seller has not waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a tax assessment or deficiency, which currently remains in effect.

(e) To Seller's Knowledge, no deficiencies for Taxes have been claimed, proposed or assessed by any Governmental Authority for which Seller may have any liability or which may attach to the Purchased Assets. There are no pending or, to Seller's Knowledge, threatened proceedings for or relating to any liability in respect of Taxes for which Seller may have any liability or which may attach to the Purchased Assets. There are no matters under discussion by Seller with any Governmental Authority with respect to Taxes that may result in an

16

additional amount of Taxes for which Seller may have any liability or which may attach to the Purchased Assets. No Governmental Authority has notified Seller that it has conducted an audit of any Taxes that may be due and owing by Seller or as the result of the Business audited by Seller, which currently remains outstanding or unresolved.

**3.17** **No Other Representation and/or Warranty.** Except for the representations and warranties contained in this <u>Article 3</u> (including the related portions of the Schedules), Seller has not made and does not make any other express or implied representation or warranty, either written or oral, on behalf of or with respect to Seller, the Purchased Assets, the Facility or the Business, including any representation or warranty arising from statute or otherwise in law. Buyer is purchasing the Purchased Assets from Seller on an **"As Is, Where Is" and "With All Faults"** basis and **Seller makes no warranty, express or implied, with respect to the condition of the Purchased Assets acquired by Buyer hereunder, including warranties of merchantability or fitness for a particular purpose, and all such warranties are hereby expressly disclaimed**

**ARTICLE 4**
**REPRESENTATIONS AND WARRANTIES OF BUYER**

In order to induce Seller to enter into this Agreement, Buyer makes the representations and warranties set forth below which are true, correct and complete on the Execution Date and shall be true, correct and complete as of the Closing.

**4.1** **Organization.** Buyer has full power, authority and capacity to execute and deliver this Agreement and the Related Agreements and to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.

**4.2** **Execution and Delivery.** This Agreement has been duly and validly executed and delivered by Buyer and constitutes and, upon the execution and delivery by Buyer of the Related Agreements, the Related Agreements shall constitute, legal, valid and binding obligations of Buyer enforceable against Buyer in accordance with their terms.

**4.3** **Governmental Approvals and Filings.** Except for the Sale Order, no consent, approval or action of, filing with or notice to any Governmental Authority on the part of Buyer is required in connection with the execution, delivery and performance of this Agreement or any of the Related Agreements or the consummation of the transactions contemplated hereby or thereby.

**4.4** **Brokers.** Buyer has not incurred any liability for any fee or commission to any broker, finder, investment banker or other intermediary in connection with the transactions contemplated by this Agreement that would result in any liability, fee, expense or obligation being imposed on Seller.

**4.5** **Adequate Funds.** At the Closing, Buyer will have adequate funds available to it in order to consummate the transactions contemplated by this Agreement and the Related Agreements and to perform its obligations hereunder and thereunder. As of the Execution Date, Buyer has the ability to obtain funds in cash in amounts equal to the Purchase Price by means of credit facilities or otherwise and will at the Closing have immediately available funds in cash, which are sufficient to pay the Purchase Price and to pay any other amounts payable pursuant to this Agreement and to consummate the transaction contemplated herein.

17

**4.6     Condition of Assets.**

(a)     EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, SELLER MAKES NO WARRANTIES, EXPRESS OR IMPLIED (INCLUDING WARRANTIES OF MERCHANTABILITY, HABITABILITY, OR FITNESS FOR A PARTICULAR PURPOSE), WITH RESPECT TO THE PURCHASED ASSETS. BUYER HEREBY ACCEPTS THE PURCHASED ASSETS IN THEIR "AS IS, WHERE IS," "WITH ALL FAULTS," CONDITION AND ALL LATENT OR PATENT DEFECTS. BUYER UNDERSTANDS AND AGREES THAT BUYER'S SOLE RECOURSE FOR ANY BREACH OF A REPRESENTATION AND WARRANTY MADE BY SELLER UNDER THIS AGREEMENT PRIOR TO CLOSING IS TO TERMINATE THE AGREEMENT IN ACCORDANCE WITH Article 7 AND THAT ALL OF SELLER'S REPRESENTATIONS AND WARRANTIES SHALL EXPIRE UPON THE OCCURRENCE OF, AND SHALL NOT SURVIVE, THE CLOSING AND THAT BUYER SHALL HAVE NO RECOURSE TO SELLER FOR ANY BREACH OF SELLER'S REPRESENTATIONS AND WARRANTIES CONTAINED HEREIN EITHER PRIOR TO OR FOLLOWING THE CLOSING. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED ABOVE, SELLER SHALL BE LIABLE TO COMPLY WITH ANY AND ALL POST-CLOSING COVENANTS CONTAINED IN THIS AGREEMENT.

(b)     The provisions of this Section will survive the Closing.

## ARTICLE 5
## COVENANTS

**5.1     Access to Books and Records.**  From and after the Closing, Buyer shall afford, for a period ending on the date of the entry of a final decree or an order converting or dismissing the Bankruptcy Cases, Debtors and Debtors respective representatives reasonable access, during normal business hours, to the books, records and other data relating to the operation of the Business prior to the Closing in its possession to the extent that such access may be reasonably required by the requesting Party in connection with (a) the preparation of Tax returns, (b) the determination or enforcement of rights and obligations under this Agreement, (c) compliance with the requirements of any Governmental Authority, (d) in connection with any threatened or actual legal proceeding, (e) in connection with any audit of the Business for any pre-Closing period, or (f) in connection with administering the Bankruptcy Cases, or any subsequent Chapter 7 case.  During such period neither Party shall dispose of or destroy any books, records or other data relating to the operation of the Business prior to the Closing unless such Party gives the other Party thirty days' prior written notice thereof and the option to retain such books, records or other data.

**5.2     Cooperation; Approvals.**  Subject to the terms and conditions herein provided, the Parties shall use commercially reasonable efforts to bring about the satisfaction as soon as practicable of all the conditions (whether set forth in this Agreement or otherwise) necessary to effect the consummation of the transactions contemplated by this Agreement.

**5.3     Further Assurances.**  Subject to the terms and conditions of this Agreement, at any time or from time to time after the Closing, at Buyer's reasonable request, Seller will execute and deliver to Buyer such other instruments of sale, transfer, conveyance and assignment, provide

such materials and information and take such other actions as Buyer may reasonably deem necessary or desirable in order more effectively to transfer, convey and assign to Buyer, and to confirm Buyer's title to, all of the Purchased Assets.

5.4     **Buyer's Closing Deliveries.**  At the Closing, Buyer shall deliver the following to Seller:

(a)     the Purchase Price;

(b)     the Related Agreements to which Buyer is a party, duly executed by Buyer;

(c)     a certificate executed as of the Closing Date by a duly authorized representative of Buyer, certifying that the conditions set forth in this Agreement have been satisfied; and

(d)     all other documents and instruments contemplated to be delivered by Buyer pursuant to this Agreement.

5.5     **Seller's Closing Deliveries.**  At the Closing, Seller shall deliver the following to Buyer:

(a)     the Related Agreements to which Seller is a party, duly executed by Seller;

(b)     all other documents and instruments contemplated to be delivered by Seller pursuant to this Agreement.

5.6     **Employees.**  Immediately prior to the Effective Time (the "**Termination Date**"), Seller shall terminate all of its employees, and, as of the Effective Time, Buyer may, at its option, offer employment to such persons on an at-will basis and subject to Buyer's pre-employment screenings and employment practices, policies and procedures.  Seller agrees to use its commercially reasonable efforts to make employment records and other related information reasonably requested by Buyer available to Buyer, subject to Applicable Law.

5.7     **Assumed and Assigned Contracts.**

(a)     Cure Process.  Buyer shall assume all obligations from and after the Closing Date under Assumed Contracts, and at such time as is required by the Bankruptcy Court in the Sale Order.  Seller shall be required to pay cash or other acceptable consideration to the third party (or parties) to the applicable Assumed Contract (each, a "**Contract Party**") in order to cure the monetary defaults and satisfy any pecuniary obligations of Seller (or obtain waivers with respect thereto) with respect to the Business, and to provide adequate assurance of future performance under the Assumed Contracts.

(b)     Identification of Assumed Contracts.  Schedule 5.7(b) identifies all Contracts Buyer wishes to be assumed by Seller and assigned by Seller to Buyer at Closing (the "**Assumed Contracts**") with all other Contracts that Buyer will not be seeking to be assigned by Seller to be considered rejected contracts (the "**Rejected Contracts**"), provided that Buyer may modify Schedule 5.7(b) up to three (3) Business Days before the Closing Date.  Seller shall move

19

to assume and assign to Buyer, effective as of the Closing Date, any Assumed Contract that is designated on or before the 10th day after the Execution Date by Buyer to Seller. Notwithstanding anything to the contrary set forth herein, Buyer shall be permitted to remove any Contract from the Assumed Contracts list (thereby automatically treating it as Rejected Contracts until three Business Days before the Closing Date. After the Closing Date, Seller shall be released from any further liability under such Assumed Contracts as provided for under Section 365(k) of the Bankruptcy Code.

(c)     <u>Non-Assignment of Assets</u>.  Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer and shall not affect the assignment or transfer of any Purchased Asset if (i) notwithstanding section 365 of the Bankruptcy Code, an attempted assignment thereof, without the approval, authorization or consent of, or granting or issuance of any license or permit by, any third party thereto would constitute a breach thereof, or (ii) the Bankruptcy Court shall not have approved assumption and assignment of any Assumed Contract for any reason (each such action in (i) and (ii), a "**Necessary Consent**").  In such event, Seller and Buyer shall use their commercially reasonable efforts, to obtain the Necessary Consents with respect to any such Assumed Contract after the Closing; provided that the failure to obtain any Necessary Consent shall not delay the Closing or give rise to a reduction in the Purchase Price.  Nothing in this <u>Section 5.7</u> shall in any way diminish or enlarge (x) Buyer's obligations hereunder to obtain the applicable Approvals, or (y) the Parties' obligations hereunder to obtain the Necessary Consents.

**5.8     Seller-Specific Covenants.**  From the Execution Date until the earlier of termination of this Agreement or the Closing, Seller shall use commercially reasonable efforts to (except as otherwise consented to or approved by Buyer in writing, which consent or approval shall not be unreasonably withheld, conditioned or delayed):

(a)     operate the Business in the ordinary course consistent with Seller's past practices, as operated during Seller's bankruptcy;

(b)     preserve and keep all its books and records related to or prepared in connection with the Purchased Assets, subject to Seller's normal document retention protocol;

(c)     obtain, on or prior to the Closing, any consents required to be obtained by Seller necessary for Seller to fulfill its obligations to consummate the transactions contemplated hereby;

(d)     comply in all material respects with all Applicable Laws, in conjunction with the execution, delivery and performance of this Agreement and the transactions contemplated hereby;

(e)     timely file federal, state, and local tax returns, and pay all amounts then due (other than those amounts being disputed in good faith and with appropriate proceedings), with respect to all periods through and including the Closing Date, subject to the claims allowance process in the Bankruptcy Cases;

(f)     not sell, lease or otherwise dispose of all or any part of any Facility or the Purchased Assets other than in the ordinary course of business;

20

(g)      not enter into any agreement for the performance of material capital expenditures at the Facility (or any portion thereof) which will not be paid for by Seller prior to the Closing or enter into any capital or equipment leases;

(h)      promptly notify Buyer of any litigation, arbitration or administrative proceeding pending or, to Seller's Knowledge, threatened against Seller which challenges the transactions contemplated herein;

(i)      reasonably cooperate with Buyer with respect to all transitional matters;

(j)      not increase in any manner the rate or terms of compensation or benefits of any employees, except as may be required under existing employment agreements or benefit plans or in the ordinary course of business consistent with past practices, or as provided for pursuant to the Bankruptcy Cases;

(k)      not hire any new employees other than in the ordinary course of business;

(l)      not terminate the employment of any employees (other than in the ordinary course of business);

(m)      after consultation with Buyer and after entry of the Sale Order, permit Buyer and/or its representatives to have a reasonable presence at the Facility and to interact with employees, subject to all Applicable Laws; and

(n)      afford Buyer and Buyer's employees, auditors, legal counsel, lenders, or other authorized representatives all reasonable opportunity and access during normal business hours upon reasonable prior notice to Seller.

**5.9**      **Accounts Receivable.**  All Accounts Receivable as and when paid and received shall be the property of Buyer and to the extent Seller controls any accounts into which Accounts Receivable are paid or otherwise receives payment on any Account Receivable after the Closing, then Seller shall hold such funds in trust for Buyer and shall remit all such funds to Buyer within ten Business Days of receipt. Seller shall provide Buyer with access to all accounts into which Accounts Receivable are paid.

**5.10**      **Trade Name.**  From and after the Closing, Seller shall not use, license or authorize any third party to use any name, slogan, logo, trademark or trade name which is similar or deceptively similar to any of the trademarks or any other name used by Seller in connection with the Business since January 1, 2018.  At or promptly following the Closing Date, Seller shall change its corporate name to any name other than (or that is not confusingly similar to, uses or incorporates) "Offshore Spar", "Offshore" or "Spar" and shall withdraw from each jurisdiction that it has qualified to do business.

**5.11**      **Survival.**  The provisions of Sections 5.1, 5.3, 5.7, and 5.9 will survive the Closing.

## ARTICLE 6
## CONDITIONS TO CLOSING

DocuSign Envelope ID: D2E29CB8-D025-4496-A6E0-3E9B42112047

**6.1** **Conditions to Obligations of Seller to Close.** The obligation of Seller to effect the closing of the transactions contemplated by this Agreement is subject to the satisfaction prior to or at the Closing of the following conditions, any of which may, in sole discretion of Seller, be waived in whole or in part:

(a) <u>Bankruptcy Matters</u>. The Bankruptcy Court shall have entered the Sale Order on terms satisfactory to Buyer approving a sale to Buyer and it shall not be subject to a stay pending appeal.

(b) <u>Observance and Performance</u>. Buyer shall have performed and complied with, in all material respects, all covenants and agreements required by this Agreement to be performed and complied with by it prior to or as of the Closing Date, and all representations and warranties of Buyer shall remain true and correct as of Closing.

(c) <u>Buyer Transaction Documents</u>. Buyer shall have delivered to Seller all the documents, instruments and agreements set forth in <u>Section 5.4</u>.

(d) <u>No Legal Actions</u>. No Governmental Authority shall have issued an order, not subsequently vacated, restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement.

**6.2** **Conditions to Obligation of Buyer to Close.** The obligation of Buyer to affect the closing of the transactions contemplated by this Agreement is subject to the satisfaction prior to or at the Closing of the following conditions, any of which may, in Buyer's sole discretion, be waived in whole or in part:

(a) <u>Compliance by Seller with Covenants and Representations Correct</u>. All the covenants and obligations of this Agreement to be complied with and performed by Seller at or before the Closing Date shall have been complied with and performed in all material respects. The representations and warranties made by Seller in this Agreement that are not qualified as to "materiality" shall be true and correct in all material respects as of the date hereof, and all representations and warranties that are qualified as to "materiality" or "material adverse effect" shall be true, correct and complete in all respects, as of the date hereof. The representations and warranties made by Seller in this Agreement (other than those that speak as of a specified date or time) shall be true and correct in all respects, as of the Closing Date, with the same force and effect as though such representations and warranties had been made on and as of the Closing Date, except to the extent such failure to be true and correct has not had, and would not reasonably be expected to have, a Material Adverse Effect.

(b) <u>Seller Transaction Documents</u>. Seller shall have delivered to Buyer all the documents, instruments and agreements set forth in <u>Section 5.5</u>.

(c) <u>No Legal Action</u>. No Action or Claim shall have been instituted before any court or before or by any Governmental Authority or instrumentality seeking to prevent or enjoin the consummation of the transactions contemplated by this Agreement.

(d) <u>Bankruptcy Matters</u>. The Bankruptcy Court shall have entered the Sale Order and it shall not be subject to a stay pending appeal.

(e) <u>Material Adverse Effect</u>.  There will have occurred following the date hereof no events nor will there exist circumstances which singly or in the aggregate have resulted in a Material Adverse Effect.

(f) <u>Acceptable Environmental Reports</u>.  Buyer shall have received Acceptable Environmental Reports.

(g) <u>Completion of Diligence</u>.  Buyer is satisfied in its sole discretion with its legal, financial, accounting, product, operations, environmental, and other diligence of Seller, the Company, the Business, and the Purchased Assets.

(h) <u>Facility</u>**.**  The Lessor having executed an amended and modified Lease acceptable to Buyer in its  sole discretion (the "**Modified Lease**") and entry of an order by the Bankruptcy Court acceptable to the Buyer in its sole discretion (which provisions may be included in the Sale Order) authorizing and approving the assumption and assignment of the Modified Lease and establishing the Cure Amount not to exceed $27,500.00 (the "**Modified Lease Approval Order**").

**6.3**	**Approvals.**

(a)	Seller shall have obtained all Regulatory Approvals necessary for Seller's consummation of the transaction contemplated herein and the continued operation of the Business as set forth on <u>Schedule 6.3</u> (collectively, the "<u>Seller's Regulatory Approvals</u>")**.**

(b)	Buyer shall coordinate and cooperate with Seller to obtain Seller's Regulatory Approvals.

**ARTICLE 7**
**TERMINATION**

**7.1**	**Termination.**  This Agreement may be terminated at any time before the Closing:

(a)	by mutual written agreement of Buyer and Seller;

(b)	by either Buyer or Seller, upon written notice to the other Party, if the other Party is in material breach or default of any provision of this Agreement, or has made a representation or warranty that is not true and correct in all material respects, which breach or inaccuracy is not cured within ten Business Days after written notice thereof is received, provided, however, that the terminating party is not in material breach or default of this Agreement;

(c)	by either Buyer or Seller if the sale is disapproved by the Bankruptcy Court;

(d)	by either Buyer or Seller if the Closing has not occurred for any reason including the failure to satisfy a condition to Closing under <u>Article 6</u> by the Outside Closing Date by no fault of the Party terminating;

23

(e)     by either Buyer or Seller, if, prior to Closing, the Sale Order, after being entered by the Bankruptcy Court, has subsequently been reversed, revoked, or voided by an order of a court of competent jurisdiction;

(f)     by Buyer, if, prior to the Closing Date, Seller files a motion in the "Bankruptcy Cases" (i) seeking to dismiss the "Bankruptcy Cases" or convert the "Bankruptcy Cases" to a chapter 7 case; or (ii) to take any other action or actions adverse to Buyer or its rights and remedies hereunder or under this Agreement; and

(g)     by Buyer, in the event an appeal of the Sale Order is filed (and a stay pending appeal is granted), and not resolved to Buyer's reasonable satisfaction by the Outside Closing Date.

**7.2     Remedies.**  If the Closing does not occur in accordance with this Agreement and Buyer has defaulted under or breached this Agreement, then Seller's liquidated damages will in the amount of $10,000 and Buyer shall have no further Liabilities of any kind arising out of or relating to such default or breach.

**ARTICLE 8**
**MISCELLANEOUS**

**8.1     Expenses.**  Except as specifically set forth in this Agreement or any Related Agreement, the Parties shall bear their own expenses, including fees, disbursements and other costs of any attorneys, accountants and other advisors, in connection with this Agreement, the Related Agreements, and the transactions contemplated hereby and thereby.

**8.2     Notices.**  All notices, requests, demands and other communications made in connection with this Agreement shall be in writing and shall be (a)(i) sent by nationally recognized overnight courier for next Business Day delivery, or (ii) personally delivered by hand, *and* (b) sent by email, addressed as follows:

| | |
|---|---|
| Seller: | Offshore Spars Co.<br>50200 E. Russell Schmidt Blvd<br>New Baltimore, MI 48051<br>Attn.: Eric R. Graczyk<br>eric@offshorespars.com |
| With a simultaneous copy to: | Stevenson & Bullock, P.L.C.<br>26100 American Drive, Suite 500<br>Southfield, MI 48034<br>Attn: Elliot Crowder<br>ecrowder@sbplclaw.com |
| Buyer: | Offshore Acquisition, LLC<br>c/o Highgate LLC<br>260 East Brown Street, Suite 280<br>Birmingham, MI 48009 |

24

DocuSign Envelope ID: D2E29CB8-D025-4496-A6E0-3E9B42112047

With a simultaneous copy to:    Dykema
39577 Woodward Avenue, Suite 300
Bloomfield Hills, MI 48304
Attn: Brendan J. Cahill and Sheryl L. Toby
bcahill@dykema.com
stoby@dykema.com

or, in each case, such other address as may be specified in writing to the other Party.

All such notices, requests, demands, waivers and other communications shall be deemed to have been received (x) if by hand delivery, on the day after such delivery, (y) if by electronic means and the transmitting Party receives a transmission receipt dated the day of transmission, on the same day as the transmission, and (z) if by nationally recognized overnight courier, on the next Business Day after deposit with such courier.

**8.3    Confidentiality.**  Each Party hereto agrees that all non-public information received from the other Party or otherwise relating to such other Party or (prior to Closing), shall be confidential, and shall not be disclosed or otherwise released to any other without the written consent of the other Party.  The obligations of the Parties hereunder shall not apply to: (a) the extent that the disclosure of information otherwise determined to be confidential is anticipated hereunder or required by Applicable Law, including bankruptcy law or filings in the Bankruptcy Court; (b) the disclosure of confidential information to any financial advisors, legal advisors, other professional advisors, shareholders, investors and lenders (both actual and potential) of a Party who agree to hold confidential such information substantially in accordance with this Section or who are otherwise bound by a duty of confidentiality to such Party; and (c) such disclosures as may be contained in any transaction-specific press release approved by both Buyer and Seller, each Party agreeing not to unreasonably withhold, condition or delay its approval.

**8.4    Amendment; Waivers, Etc.**  No amendment, modification or discharge of this Agreement, and no waiver hereunder, shall be valid or binding unless set forth in writing and duly executed by the Party against whom enforcement of the amendment, modification, discharge or waiver is sought.  Any such waiver shall constitute a waiver only with respect to the specific matter described in such writing and shall in no way impair the rights of the Party granting such waiver in any other respect or at any other time.

**8.5    Headings.**  The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

**8.6    Assignment.**  Neither this Agreement nor any of the rights or obligations under this Agreement may be assigned by either Party without the prior written consent of the other Party, although no permitted assignment of this Agreement by a Party will relieve the Party of any of its obligations under this Agreement.

**8.7    Parties in Interest; No Third-Party Beneficiaries.**  This Agreement and the Related Agreements shall be binding upon and inure solely to the benefit of the Parties and their

successors and permitted assigns, and nothing in this Agreement or any Related Agreement, expressed or implied, is intended to confer upon any other Person any rights or remedies of any nature under or by reason of this Agreement or any Related Agreement. Without limiting the foregoing, nothing in this Agreement or the Related Agreements is intended to confer upon any past, present or future employee of Seller or its Affiliates or his or her legal representatives or heirs any rights as a third-party beneficiary or otherwise or any other rights or remedies of any nature or kind whatsoever under or by reason of the transactions contemplated by this Agreement or by the Related Agreements, including any rights of employment, continued employment or any rights under or with respect to any employee benefit, welfare benefit, pension or other fringe benefit plan, fund, program or arrangement.

**8.8    Counterparts; Facsimile Signature.**  This Agreement may be executed in one or more counterparts, each of which shall be deemed to constitute an original, but all of which shall constitute one and the same instrument, and shall become effective when one or more counterparts have been signed by each of the Parties. Any Party may execute this Agreement by facsimile (or .pdf copy) signature and the other Parties will be entitled to rely upon such facsimile (or .pdf copy) signature as conclusive evidence that this Agreement has been duly executed by such Party.

**8.9    Governing Law.**  Except to the extent inconsistent with the Bankruptcy Code, this Agreement and the Related Agreements shall be governed by and construed and enforced in accordance with the laws of the State of Michigan, without regard to its conflicts of law rules.

**8.10    Jurisdiction.**  Each of the Parties agrees that any proceeding brought to enforce the rights or obligations of any Party under this Agreement or any Related Agreement shall be commenced and maintained in the Bankruptcy Court, and the Bankruptcy Court shall have exclusive jurisdiction over any such proceeding.

**8.11    WAIVER OF JURY TRIAL.**  EACH PARTY TO THIS AGREEMENT HEREBY UNCONDITIONALLY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, ANY OF THE DOCUMENTS RELATED HERETO, ANY DEALINGS BETWEEN THE PARTIES RELATING TO THE SUBJECT MATTER OF THIS AGREEMENT OR ANY RELATED TRANSACTIONS.

**8.12    Severability.**  If any provision of this Agreement is inoperative or unenforceable for any reason, such circumstances shall not have the effect of rendering the provision in question inoperative or unenforceable in any other case or circumstance, or of rendering any other provision or provisions herein contained invalid, inoperative, or unenforceable to any extent whatsoever, so long as this Agreement, taken as a whole, still expresses the material intent of the Parties. The invalidity of any one or more phrases, sentences, clauses, sections or subsections of this Agreement shall not affect the remaining portions of this Agreement.

**8.13    Entire Agreement.**  This Agreement and the Related Agreements constitute the entire agreement between the Parties with respect to the subject matter hereof, and supersede all prior agreements and understandings, both written and oral, between the Parties with respect to the subject matter hereof. There are no warranties, representations or other agreements between the Parties in connection with the subject matter hereof except as set forth specifically herein.

26

**8.14    Bulk Sales or Transfer Laws.**  Buyer hereby waives compliance by Seller with the provisions of the bulk sales or transfer laws of all applicable jurisdictions.

**8.15    No Inferences.**  Inasmuch as this Agreement is the result of negotiations between sophisticated Parties of equal bargaining power represented by counsel, no inference in favor of, or against, either Party shall be drawn from the fact that any portion of this Agreement has been drafted by or on behalf of such Party.

**8.16    Interpretation.**  In this Agreement, unless the context otherwise requires: (a) references to this Agreement are references to this Agreement and to the Schedules and Exhibits hereto; (b) references to Articles and Sections are references to articles and sections of this Agreement; (c) references to any party to this Agreement shall include references to its respective successors, its designees, and permitted assigns; (d) references to a judgment shall include references to any order, writ, injunction, decree, determination or award of any court or tribunal; (e) the terms "hereof," "herein," "hereby," and any derivative or similar words will refer to this entire Agreement; (f) references to any document (including this Agreement) are references to that document as amended, consolidated, supplemented, novated or replaced by the parties thereof from time to time; (g) references to any law are references to that law as of the Closing Date, unless the context requires otherwise, and shall also refer to all rules and regulations promulgated thereunder, unless the context requires otherwise; (h) the word "including" shall mean including without limitation; (i) references to time are references to Eastern Standard or Daylight time (as in effect on the applicable day) unless otherwise specified herein; and (j) use of the singular in defined terms shall include the plural and vice versa.

**8.17    Time of the Essence.**  Time is of the essence for purposes of this Agreement and the rights and obligations of the Parties hereunder.

[Signatures Follow on Next Page]

The Parties executed and delivered this Asset Purchase Agreement as of the Effective Date.

**BUYER**

**Offshore Acquisition, LLC**

By: _S Polk_____
Stephen R. Polk
Authorized Representative

**SELLER**

**Offshore Spars Co.**

By: _Eric R. Graczyk_____

Name: Eric R. Graczyk

Title: Responsible Person

_Eric R. Graczyk_____
**Eric R. Graczyk**

28

# **EXHIBIT 6B**

(Notice of Potential Assumption and Assignment of Certain Executory Contracts
and Unexpired Leases and Proposed Cure Amounts)

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION - DETROIT**

**IN THE MATTER OF:**

| | |
|---|---|
| Offshore Spars Co., et al.[1] | Case No. 23-44657 |
| | Judge Thomas J. Tucker |
| Debtors. | Chapter 11 |
| | Jointly Administered |

### NOTICE OF POTENTIAL ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND PROPOSED CURE AMOUNTS

1.　　On November 3, 2023, Offshore Spars Co. (the "Debtor") filed its Motion (the "Motion") for Entry Of An Order (I) Approving the Sale of Assets to Offshore Acquisition, LLC Free and Clear of Liens, Claims and Encumbrances, (II) Approving the Asset Purchase Agreement, (III) Terminating Asset Purchase Agreement with Rigpro, LLC (IV), Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with the Sale; and (V) Granting Related Relief.[2] By the Motion, the Debtor seeks, *inter alia*, to sell (the "Sale") substantially all of its assets (the "Assets") and to assume and assign certain executory contracts and unexpired leases (the "Purchased Contracts") to Offshore Acquisition, LLC (the "Buyer") pursuant to an asset purchase agreement by and among the Debtor and the Buyer (the "APA"). A copy of the Motion can be obtained from counsel to the Debtor, Stevenson & Bullock, PLC, Attn.: Elliot Crowder, 26100 American Drive, Suite 500, Southfield, MI 48034. Email: ecrowder@sbplclaw.com.

2.　　Pursuant to the Motion, the Debtor may assume and assign the contract(s) and lease(s) identified on **Exhibit A** (the "Subject Contract(s)") to the Buyer.[3] The cure amount (the "Cure Amount"), if any, the Debtor believes is

---

[1] The Debtors in these jointly administered cases are Offshore Spars Co. (Case No. 23-44657) and Eric G. Graczyk (Case No. 23-44658).

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

[3] The Debtor may modify the list of contracts and leases that will be assumed and assigned in connection with the Sale. In addition, the inclusion of any contract or agreement on **Exhibit A** to the Cure Notice shall not constitute an admission by the

required to satisfy all amounts and obligations due and owing under each Subject Contract by the Debtor, including any monetary defaults and compensation for pecuniary losses, is listed on **Exhibit A** (the "Cure Schedule"). NOTE THAT IN THIS CASE, OTHER THAN WITH RESPECT TO THE MODIFIED LEASE FOR THE FACILITY, DEBTOR BELIEVES THAT NO CURE AMOUNTS EXIST AND AS SUCH THE COUNTERPARTIES CLAIMS ON THE CURE SCHEDULE ARE LISTED AS "ZERO" AMOUNTS OWED.

3.      The deadline to file an objection to the assumption and assignment of the Subject Contract(s) and the Cure Amount(s) for such Subject Contract(s) (together, "Cure Objections") is November 27, 2023 (the "Cure Objection Deadline"). Cure Objections, if any, must be filed with the Clerk of the Bankruptcy Court and served on (a) counsel to the Debtor, Stevenson & Bullock, PLC, Attn: Elliot Crowder, 26100 American Drive, Suite 500, Southfield, MI 48034; (b) counsel to the Buyer, Dykema Gossett PLLC, Attn: Sheryl L. Toby, 39577 Woodward Avenue, Suite 300 Bloomfield Hills, Michigan 48304; (c) the Subchapter V Trustee, Deborah L. Fish, 211 West Fort Street, Suite 705, Detroit, MI 48226; and (d) counsel to Pathward N.A. ("Pathward"), Taft Stettinius & Hollister LLP, Attn: Kimberly R. Clayson, 27777 Franklin Road, Suite 2500, Southfield, MI 48034 (the "Consultation Parties").

4.      Any Cure Objection must state (i) the basis for the objection and (ii) with specificity, what Cure Amount(s) the party to the Subject Contract(s) believes is required (in all cases with appropriate documentation in support thereof).

5.      Any objection solely to the Cure Amount(s) may not prevent or delay the Debtor's assumption and assignment of the Subject Contract(s). If a non-Debtor counterparty (a "Non-Debtor Counterparty") objects solely to Cure Amount(s), the Debtor may, with the consent of the Buyer, hold the claimed Cure Amount(s) in reserve pending further order of the Court or mutual agreement of the parties. So long as Cure Amount(s) are held in reserve, and there are no other unresolved objections to assumption and assignment of the applicable Subject Contract(s), the Debtor can, without further delay, assume and assign such Subject Contract(s) to the Buyer. Under such circumstances, the objecting Non-Debtor Counterparty's recourse is limited to the funds held in reserve.

---

Debtor that any such contract is an executory contract or unexpired lease within the meaning of section 365 of the Bankruptcy Code and the Debtor reserves all rights with respect thereto.

6.      Unless a Cure Objection or an objection to adequate assurance of future performance, as applicable, is filed and served by a Non-Debtor Counterparty to any Subject Contract by the Cure Objection Deadline such Non-Debtor Counterparty shall be: (i) deemed to have waived and released any right to assert a Cure Objection and to have otherwise consented to the assignment of such Subject Contract, (ii) forever barred from objecting to the assumption and assignment of such Subject Contract and (iii) forever barred and estopped from asserting or claiming any Cure Amount, other than the Cure Amount listed on the Cure Schedule.

8.      The hearings with respect to Cure Objection(s) or objection(s) to the adequate assurance of future performance may be held (a) at a date as the Court may designate.

**<u>Your rights may be affected.</u>  You may wish to review the Motion and discuss it with your attorney, if you have one in this bankruptcy case.  If you do not have an attorney, you may wish to consult one.**

If you wish to object to the Court granting the relief sought in the Motion, or if you want the Court to otherwise consider your views on the Motion, within twenty-one (21) days of service of the Motion, **or such shorter time as the Court may hereafter order**, you or your attorney must:

1.  File with the Court a written response or an answer[3] explaining your position at:

United States Bankruptcy Court
211 West Fort Street
Detroit, Michigan 48226

If you mail your response to the Court for filing, you must mail it early enough so the Court will receive it on or before the date stated above.

You must also mail a copy to the Consultation Parties as identified above.

If a response or answer is timely filed and served, the clerk may schedule a hearing on the Motion and you will be served with a notice of the date, time, and location of the hearing.

---

[3]      Response or answer must comply with FED.R.CIV.P. 8(b), (c), and (e).

If you or your attorney do not take these steps, the Court may decide that you do not oppose the relief sought in the Motion and may enter an Order granting the relief sought therein.

Respectfully submitted,
**STEVENSON & BULLOCK, P.L.C.**

By: /s/ Elliot G. Crowder
Elliot G. Crowder (P76137)
Counsel for Debtor
26100 American Drive, Suite 500
Southfield, MI 48034
Phone: (248) 354-7906
Facsimile: (248) 354-7907
Email: ecrowder@sbplclaw.com

Dated: November 3, 2023

# Exhibit A to Cure Notice

# CURE SCHEDULE

| Description of Subject Contract | Name and Contact Information of Counterparty | Cure Amount |
|---|---|---|
| Wylie 39 | GC Rigging and Composites LLC<br>800 Wharf Street<br>Pt. Richmond, CA 94804 | $0.00 |
| Alerion 30 Masts | Alerion Yachts<br>342 Compass Cir.<br>North Kingston, RI 02852 | $0.00 |
| Alerion 33 Masts | Alerion Yachts<br>342 Compass Cir.<br>North Kingston, RI 02852 | $0.00 |
| Ascent AeroSpace | Global Tooling Systems, Inc.<br>16445 23 Mile Road<br>Macomb Twp., MI 48042 | $0.00 |
| Macotta | Macotta Corporation<br>1987 Larchwood Dr.<br>Troy, MI 48083 | $0.00 |
| Macotta | Macotta Corporation<br>1987 Larchwood Dr.<br>Troy, MI 48083 | $0.00 |
| Kinetic Boom 5 | Kinetic Catmarans<br>12 New Street,<br>Knysna Western Cape, 6570<br>South Africa | $0.00 |
| Kinetic Boom 6 | Kinetic Catmarans<br>12 New Street,<br>Knysna Western Cape, 6570<br>South Africa | $0.00 |
| Hughs 56 Boom | Cory A Birnberg<br>1083 Mission St. Third Floor<br>San Francisco, CA 94103-2812 | $0.00 |
| MVM | Kevin Rivenbark<br>PO Box 862<br>Clinton, NC 28329 | $0.00 |

| | | |
|---|---|---|
| All purchase orders accepted by Seller on or after May 23, 2023. | | $0.00 |
| Lease of Facility<br><br>** Condition to close and assume and assign this lease, subject to the modification of the lease which is acceptable to Buyer in its sole discretion | Chesterfield 5, LLC<br>12955 23 Mile Road<br>Shelby Twp., MI 48315 | $27,500.00 |

# EXHIBIT 6C

(Employment Agreement)

# EMPLOYMENT AGREEMENT

This Employment Agreement ("Agreement") is entered into as of [●], 2023 (the "Effective Date"), by and between Eric Graczyk ("Executive") and Offshore Acquisition, LLC, a Michigan limited liability company (the "Company").

## Background

A.    As a condition and material inducement for the Company to enter into that certain Asset Purchase Agreement, dated as of November 2, 2023 (the "Purchase Agreement"), by and among the Company, Executive, and Offshore Spar, Co. ("Offshore Spar"), the Company and Executive desire to enter into this Agreement to document Executive's employment with the Company under the terms and conditions set forth in this Agreement.

B.    Executive is the sole member of the sole shareholder of Offshore Spar and will directly and indirectly benefit from the completion of the transactions contemplated by the Purchase Agreement.

C.    Executive possesses a level of skill, experience, and know-how crucial to the success of the Company and such skill, experience, and know-how is an essential component of the Company's desire to acquire the Company pursuant to the Purchase Agreement.

D.    Executive acknowledges the necessity of Executive agreeing to be bound by certain restrictive covenants set forth in this Agreement.

Now, therefore, in consideration of the covenants set forth in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows.

## Agreement

**1.    Definitions.** For purposes of this Agreement, the following terms shall have the meanings set forth below.

"Business" means the business activities conducted the Company during the Employment Term, including the business of designing and manufacturing carbon fiber and composite products for the boat building, aerospace, automotive, and construction industries.

"Business Associate" means any current or former employee, contractor, subcontractor, representative, consultant, agent, or member of the Company.

"Cause" means any of the following, as reasonably determined by the Board:

(a)    gross negligence in the performance by Executive of his duties with the Company, a violation of any material policy of any member of the Company applicable to Executive, or any material breach by Executive of any representation, warranty or covenant of Executive set forth in this Agreement;

(b)    failure or refusal of Executive to follow reasonable and lawful directives of the Board which are consistent with Executive's position with the Company;

(c)    (i) intentional, grossly negligent or willful misconduct or omission by Executive that causes any material injury to the financial condition, business or reputation of the Company, or (ii)

conduct by Executive that constitutes a violation of any law or Company policy respecting employment discrimination or harassment;

(d)     any act of fraud, theft, bad faith, misappropriation, conversion or embezzlement or other similar conduct with respect to any aspect of the Business or assets of the Company (including acceptance of bribes or kickbacks or other acts of self-dealing);

(e)     (i) non-prescription drug use, alcohol use or the improper use of prescription drugs that interferes with the performance by Executive of Executive's duties to the Company, or (ii) the illegal use, possession or sale of any controlled substance; or

(f)     commission, indictment, a plea of *nolo contendere* or conviction of (i) a felony, or a crime involving fraud, moral turpitude or misrepresentation, or (ii) any other crime the effect of which is reasonably likely to have a material adverse effect on the business or reputation of the Company.

"Company" means the Company and any direct and indirect subsidiaries of the Company.

"Company Innovations" means all Innovations, and any associated intellectual property rights, which Executive may solely or jointly Create, during Executive's employment with the Company, and which either (a) relate, at the time Created, to the Business or actual or reasonably and demonstrably anticipated research or development, or (b) were developed on any amount of the Company's time or with the use of any of the Company's equipment, supplies, facilities or trade secret information, or (c) resulted from any work Executive performed for the Company.

"Competing Services or Products" means any service or product, in existence or under development, that competes with, or that is intended to compete with or displace in the market, any of the services or products provided or sold by the Company as part of the Business as of the Termination Date.

"Confidential Information" means information regarding the Business or the Company that has not been disclosed by the Company to the public and is not generally known to the public which shall include the following with respect to the Business or the Company:  (a) information regarding operations, assets, liabilities or financial condition; (b) information regarding bidding, quotations, price, sales, merchandising, marketing and promotions (including marketing strategies and concepts), advertising campaigns, capital expenditures, costs, joint ventures, business alliances, products, services or purchasing; (c) information regarding the terms, conditions and employment relationship of the Company has with employees, including, non-public information regarding their monetary compensation, benefits and employee personnel files; (d) information regarding Business Associates other than employees, including their identities, responsibilities, qualifications, benefits, compensation and files; (e) information regarding Customers, including customer lists, databases and other information related to current or prospective customers, including information regarding their identities, contact persons and purchasing patterns; (f) information regarding current vendors, suppliers, distributors or other business partners; (g) forecasts, projections, budgets and business plans; (h) information regarding the planned or pending acquisitions, divestitures or other business combinations; (i) information regarding the creation and formulation of any service or product, whether now in existence or under development; (j) technical information, models, know-how, protocols, discoveries, designs (including dress and ornamental designs), prints,  patterns, images, pictorials, sculptures, graphics, color arrangements, combinations of elements, formulas, patterns, devices, secrets, inventions, improvements, techniques, processes, compilations of information, records, specifications, business methods, equipment, trade secrets and proprietary information; and (k) demonstrably contemplated website designs, website content, domain names, data bases, internet hyperlinks, internet banners and internet search engine listings.  Notwithstanding the foregoing, Confidential Information shall be treated as such under this Agreement unless and until it becomes generally

known to the public through no act or fault of Executive and through no fault of any other Person who has an obligation not to disclose such Confidential Information. This definition applies to all Confidential Information, regardless of when such information is or was disclosed to Executive.

"Control" or "Controlled by" means possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of an entity, whether through ownership of voting securities, by contract or otherwise.

"Create" means to create, conceive, reduce to practice, derive, develop or make.

"Customer" means any Person who is or has been a customer of the Company within the one-year period immediately preceding the Termination Date and with whom Executive had contact, or about whom Executive had access to Confidential Information, during such period.

"Disability" means (a) a physical or mental condition that causes Executive to be unable to perform, with or without reasonable accommodation, Executive's essential job functions for one hundred eighty or more calendar days within any twelve month period, or (b) Executive is receiving long term disability benefits under any policy, plan or program in which Executive participates as an employee of the Company.

To "Engage" in a business means (a) to render services in or provide advice with respect to that business, or (b) to own, manage, operate or Control (or participate in the ownership, management, operation or Control of) an enterprise engaged in that business, in each case, whether as an owner, partner, member, shareholder, independent contractor, employee, consultant, agent, lender, lessor, lessee, licensor, licensee or advisor.

"Innovations" means processes, machines, manufactures, compositions of matter, improvements, inventions (whether or not protectable under patent laws), information, designs, improvements and discoveries which are now known or later discovered, works of authorship, copyrights, derivative works, or any creative expression fixed in any tangible medium now known or later developed (whether or not protectable under copyright laws), mask works, trademarks, service marks, domain names, trade names, trade dress, trade secrets, know-how, ideas (whether or not protectable under trade secret laws), and other subject matter protectable under patent, copyright, moral rights, mask work, trademark, trade secret or other laws regarding proprietary rights, including new or useful art, combinations, discoveries, formulae, designs (including dress and ornamental designs), prints, patterns, images, pictorials, sculptures, graphics, color arrangements, combinations of elements, manufacturing techniques, technical developments, discoveries, artwork, or software, and all documentation associated therewith, whether registered with a government agency charged with granting proprietary rights, or used and practiced at common law, worldwide.

"Person" means any natural person, corporation, partnership, limited liability company, trust, estate, association, governmental authority or other entity of any kind.

"Prior Innovations" means Innovations relating to the Business or reasonably and demonstrably anticipated research and development, which Executive Created prior to the start of Executive's employment by the Company.

"Proprietary Rights" means rights to Innovations and other proprietary rights.

"Release" means a written release, in form and substance reasonably satisfactory to the Company, whereby Executive waives and releases the Company and its affiliates and related parties from any and all claims that Executive may have against the Company and its affiliates and related parties in connection with Executive's employment with the Company or the termination thereof, provided that the Release will

not apply to the Company's obligations under Section 9 including any compensation or benefits referred to in Section 9(c).

"Restricted Period" means the period commencing on the Effective Date and ending on the first anniversary of the Termination Date.

"Severance Period" means the three months immediately after the Termination Date.

"Solicit" or "Solicitation" means to encourage or induce, or to take any action that is intended or calculated to encourage or induce or which is reasonably likely to result in encouragement or inducement.

"Subsidiary" of a specified Person means (a) an entity that is directly or indirectly Controlled by the specified Person, or (b) an entity in which the specified Person, directly or indirectly, owns a majority economic interest.

"Termination Date" means the date on which Executive's employment with the Company ends for any reason, including termination by the Company, death, Disability or resignation.

"Territory" means anywhere in North America (including each state or province (as applicable) in the United States of America, Canada and Mexico).

2.     **Employment.**  The Company hereby employs Executive, and Executive agrees to serve, as the President of the Company (the "Position").

3.     **Duties.**  During the Employment Term, Executive shall perform such services as are commensurate with the Position, including such duties and responsibilities as may from time to time be assigned to Executive by the Board. Executive shall (a) faithfully, diligently and competently perform such services, (b) devote Executive's full business time and attention to the affairs of the Company, and (c) comply with all rules and regulations from time to time promulgated by the Company that are applicable to Executive.

4.     **No Other Employment.**  During the Employment Term, Executive shall not, directly or indirectly, render services to any other Person without the prior approval of the Board.  Nothing in this Agreement, however, shall restrict Executive from providing services without compensation in connection with civic or charitable activities, provided in each case that such services do not violate Sections 10 or 11 and do not interfere with Executive's performance of Executive's duties under this Agreement. Notwithstanding anything herein, the Executive is permitted to engage in passive business activities including, without limitation, real estate investing, so long as such activities do not impair in any material respect Executive's ability to provide services to the Company.

5.     **Employment Term.**   The period during which Executive is employed under this Agreement (the "Employment Term") shall start on the Effective Date and end on the third anniversary of the Effective Date, unless terminated sooner as provided herein. The Employment Term shall automatically renew for successive one year terms ending on the applicable anniversary of the Effective Date (each, a "Renewal Term"), unless at least thirty days prior to the end of the Employment Term, or Renewal Term, as applicable, either party delivers written notice to the other party that it has elected not to so extend the term. Notwithstanding the foregoing, the Employment Term may be terminated as provided herein prior to the date on which it would otherwise expire or be renewed.  If, following the expiration of the Employment Term, Executive remains employed by the Company as an at-will employee, the provisions of Sections 4, 10, 11, 12, 13, 14, 15, 16 and 17 shall remain in effect throughout such period of at-will employment and (to the extent provided therein) after employment.

6. **Compensation.**

(a) During the Employment Term, the Company shall pay to Executive a salary (the "Base Salary") at a base salary rate of $150,000 per annum (prorated for any partial year and subject to applicable withholdings). The Base Salary shall be payable in accordance with the Company's ordinary payroll practices.

(b) During the Employment Term, in the sole and exclusive discretion of the Board, Executive shall be eligible to receive an annual cash bonus (the "Annual Bonus") for each calendar year in accordance with, and subject to the terms and conditions of, the annual incentive program established by the Board. The Annual Bonus, if any, shall only be payable to Executive if Executive was employed on the last day of the year for which the Annual Bonus is to be paid. The amount of the Annual Bonus, if any, shall be paid not later than the earlier of (i) 120 days following the end of the calendar year for which the Annual Bonus is being paid, or (ii) ten days following completion of the audited financial statements for the calendar year for which the Annual Bonus is being paid.

7. **Benefits.**

(a) During the Employment Term, Executive shall be entitled to participate in such employee benefit plans and programs as are maintained from time to time for employees of the Company. The Company shall not be obligated to adopt or continue any particular plan or program during the Employment Term, and Executive's (and Executive's dependents') participation in any such plan or program shall be subject to the provisions, rules, regulations and laws applicable thereto.

(b) During the Employment Term, Executive shall be entitled to paid time off ("PTO") in accordance with the Company's PTO policy, and to such paid holidays as are observed by the Company from time to time. For purposes of this Section 7(b), "year" means the twelve month period the Company uses administratively for purposes of vacation records. As a required by applicable law, all PTO which is unused at the end of a calendar shall be forfeited.

(c) During the Employment Term, Executive shall be entitled to the use of a Company vehicle, which shall remain property of the Company. The Company shall pay customary insurance for the vehicle and shall reimburse Executive for other regular expenses.

8. **Reimbursement of Expenses.** Executive shall be entitled to reimbursement for ordinary, necessary and reasonable out-of-pocket business expenses which Executive incurs in connection with performing Executive's duties under this Agreement consistent with current policies of the Company

9. **Termination.**

(a) Executive may resign from employment with the Company at any time upon thirty days' prior written notice to the Company. The Company may terminate Executive's employment at any time with Cause upon written notice to Executive or at any time without Cause upon thirty days' prior written notice to Executive. Notification of termination for Cause may be made at any time after the Board becomes aware of the occurrence or continuance of any of the reasons for Cause set forth in this Agreement. Executive's employment shall terminate automatically upon Executive's death. The Company may terminate Executive's employment upon Executive's Disability. If the Company terminates Executive's employment for Cause or on account of Executive's Disability, Executive's employment terminates upon Executive's death, or Executive resigns, then the Company shall have no further obligations from and after the date of such termination, except for payment of the compensation described in Section 9(b) and the

23-44657-tjt   Doc 128   Filed 11/03/23   Entered 11/03/23 09:03:42   Page 112 of 120

Company shall have all other rights and remedies available under this or any other agreement and at law or in equity.

(b) If a Termination Date occurs, then Executive shall be entitled to: (i) the Base Salary through the Termination Date payable as described above; (ii) benefits (including payment for unused PTO for the applicable calendar year) as provided in Section 7 through the Termination Date pursuant to the terms of the plan or policy under which such benefits are provided (with respect to payment of unused PTO, under the terms of the Company's PTO policy); and (iii) reimbursement of expenses incurred by Executive through such date as provided in Section 8, provided that, for the sake of clarity, in no event shall any reimbursement be made later than the longest time period specified in Section 15(f).

(c) If the Company terminates Executive's employment without Cause (and not for Disability and not due to a non-renewal), then, in addition to the compensation described in Section 9(b), during the Severance Period the Company shall (i) continue to pay Executive salary continuation payments (the "Severance Payments") at the payroll rate of 100% of the Base Salary then in effect for the payroll payment periods, and (ii) continue to provide to Executive the benefits described in Section 7(a), either directly or by way of reimbursing Executive's applicable COBRA payment obligations. Severance Payments shall be payable in accordance with the Company's ordinary payroll practices over the applicable Severance Period. Notwithstanding any provision to the contrary herein, and without limitation of any remedies to which the Company may be entitled (including under this Agreement or applicable law): (i) the Company shall not be required to make any Severance Payments unless Executive signs and delivers to the Company a Release within thirty days following the termination of Executive's employment and does not revoke such Release within the applicable revocation period (if any), and (ii) Executive shall not be entitled to any Severance Payments with respect to any portion of the Severance Period following the Executive's violation any of Executive's obligations under Sections 10, 11, 12 or 13.

(d) Except as expressly provided in this Section 9 and except for benefits to the extent required under employee benefit plans or applicable law, Executive shall not be entitled to any compensation or other severance benefits upon termination of employment.

10. **Non-Compete and Non-Solicitation.** By and in consideration of the Company's entering into this Agreement, and in further consideration of Executive's exposure to the Confidential Information of the Company and as a material inducement for the Company to enter into the Purchase Agreement and consummate the transaction contemplated therein, Executive agrees that, from and after the Effective Date and continuing through the Restricted Period, Executive shall not do any of the following, directly or indirectly, other than on behalf of the Company:

(a) Engage in the Business anywhere in the Territory;

(b) Solicit or assist any other Person to Solicit any Person who is or has been a supplier, vendor, customer, licensor, client, dealer, distributor, licensor, licensee or any other business relation of the Company (i) to cease doing business with the Company, (ii) to adversely alter or limit its business relationship with the Company, or (iii) to purchase, other than from the Company, any Competing Services or Products;

(c) market, promote, sell, offer to sell, or provide any Competing Services or Products to any Customer, or assist any other Person to do so;

(d) Solicit or assist any Person to Solicit any Business Associate to terminate, restrict or hinder his, her or its association with the Company; or

(e)     recruit, interview, Solicit, hire or otherwise retain the services of any Business Associate, whether on a full-time basis, part-time basis or otherwise and whether as an employee, officer, director, independent contractor, consultant, advisor, agent or in another capacity, or assist any other Person to do so;

provided, however, that nothing in this Agreement shall prevent Executive from owning less than 2% of any class of publicly traded securities so long as such investment is passive and Executive has no other involvement with the issuer of such securities.

**11.     Confidential Information.** Executive, during the term of this Agreement, will have access to and become familiar with various trade secrets, including formulas, patterns, devices, secret inventions, processes, and compilations of information, records, and specifications, which are owned by the Company and which are regularly used in the operation of the Business.  Executive agrees to maintain all Confidential Information that constitutes a trade secret, in strict confidence and not to disclose such Confidential Information to any Person outside of the Company or use such Confidential Information for the benefit of Executive or any Person outside of the Company at any time (including after termination of Executive's employment).  Executive agrees to maintain all Confidential Information that does not constitute a trade secret, in strict confidence and not to disclose such Confidential Information to any Person outside of the Company or use such Confidential Information for the benefit of Executive or any Person outside of the Company during Executive's employment with the Company and within the Territory for two years after that employment ends (regardless of the reason).  Nothing in this Agreement, however, prohibits Executive from: (i) disclosing any information (or taking any other action) in furtherance of Executive's duties to the Company while employed by the Company; or (ii) disclosing Confidential Information to the extent required by law (after giving prompt notice to the Company before such disclosure in order that the Company may attempt to obtain a protective order or other assurance that confidential treatment will be accorded such information and reasonably cooperate with the Company (at the Company's expense with respect to any reasonable and necessary out-of-pocket expenses incurred by Executive to cooperate to the extent such expense has been approved in advance by the Company) in attempting to obtain such order or assurance).  Upon the Company's request at any time, Executive shall deliver as soon as administratively practicable (but in any event within seven days) to the Company all tangible items in Executive's possession or control that are or that contain Confidential Information, without keeping any copies; provided, however, that Executive may retain copies of documents relating to any employee benefit plans applicable to Executive and income records to the extent necessary for Executive to prepare Executive's individual tax returns.  All files, records, documents, drawings, specifications, equipment, and similar items relating to the business of the Company, whether prepared by Executive or otherwise coming into Executive's possession or control, shall remain the exclusive property of the Company and shall not be removed from the premises of the Company under any circumstances whatsoever without the prior written consent of the Company, except in connection with the perform Executive's duties under this Agreement.

**12.     Ownership of Innovations.**

(a)     All Company Innovations shall be the sole and exclusive property of the Company without further compensation and are "works made for hire" as that term is defined in the copyright laws of the United States.  Executive shall promptly notify the Company of any Company Innovations that Executive solely or jointly Creates.

(b)     Executive agrees that Executive will promptly from time to time fully inform and disclose to the Company all Innovations which Executive now has or may hereafter have during the term of this Agreement which pertain or relate to the business of any member of the Company or any experimental work carried on by Executive, whether conceived by Executive alone or with others and whether nor not conceived during regular working hours.  Executive hereby agrees that Company will be

the owner of all Company Innovations, and irrevocably assigns (and will assign) to the Company all Company Innovations, and in connection with any trademark or service, all good will of the business symbolized thereby. Executive shall perform (at the Company's expense), during and after Executive's employment, all acts deemed necessary or desirable by the Company to assist the Company in obtaining and enforcing the full benefits, enjoyment, rights and title throughout the world in the Company Innovations. Such acts may include execution of documents and assistance or cooperation (i) in the filing, prosecution, registration, and memorializing of assignment of patent, copyright, derivative works, mask work, trademark, service mark or other applications for Proprietary Rights, (ii) in the enforcement of any applicable Proprietary Rights, and (iii) in other legal proceedings related to the Company Innovations.

(c)     If the Company is unable for any reason to secure Executive's signature to any document required to file, prosecute, register, or memorialize the assignment of any patent, copyright, mask work or other applications or to enforce any Proprietary Rights regarding any Company Innovations (including derivative works, improvements, renewals, extensions, continuations, divisionals, continuations in part, continuing patent applications, reissues, and reexaminations), Executive hereby irrevocably designates and appoints the Company and the Company's authorized officers and agents as Executive's agents and attorneys-in-fact to act for and on behalf of Executive solely and exclusively (i) to execute, file, prosecute, register and memorialize the assignment of any such application, (ii) to execute and file any documentation required for such enforcement, and (iii) to do all other reasonable and lawfully permitted acts to further the filing, prosecution, registration, memorialization of assignment, issuance, and enforcement of Proprietary Rights regarding Company Innovations, all with the same legal force and effect as if executed by Executive.

(d)     Executive represents and warrants to the Company that, to Executive's actual knowledge, no Person (other than the Company) has any rights in any Prior Innovations.

(e)     Executive hereby grants to the Company or the Company's designees a royalty free, irrevocable, worldwide license (with rights to sublicense through multiple tiers of sublicensees) to practice all applicable Proprietary Rights relating to any Prior Innovations which Executive incorporates, or permits to be incorporated, in any Company Innovations. To the extent any of the rights, title and interest in and to the incorporated Prior Innovations cannot be licensed by Executive to the Company, Executive hereby irrevocably waives and agrees never to assert such non-licensable rights, title and interest against the Company (or its successors or assigns). Notwithstanding the foregoing, Executive agrees not to incorporate, or permit to be incorporated, any Prior Innovations in any Company Innovations without the Company's prior written consent.

(f)     No provision in this Agreement is intended to require Executive to assign or offer to assign any of Executive's rights in any invention for which no equipment, supplies, facilities, or trade secret information of the Company were used, and which was developed entirely on Executive's own time, unless the invention relates to the Business or to the Company's actual or reasonably and demonstrably anticipated research or development, or the invention results from any work performed by Executive for the Company. Executive shall bear the burden of proving that Executive's invention qualifies under this Section 12(f).

**13.     Non-Disparagement; Non-Endorsement.**

(a)     From and after the date hereof, Executive shall not, directly or indirectly, make (or cause to be made) to any Person any disparaging, derogatory or other negative or false statement about the Company, including its products, services, policies, practices, operations, employees, sales representatives, agents, officers, members, managers, partners or directors.

(b)     During the Restricted Period, Executive shall not, directly or indirectly, make (or cause to be made) to any Person any endorsement or other commercially supportive statement about any Person Engaged in whole or in part in the Business (including any such Person's products, services, equipment, suppliers, policies, practices, operations, employees, sales representatives, independent contractors, licensees, advisors, agents, officers, directors, shareholders, members, managers, partners, Subsidiaries or other Affiliates), if such endorsement or statement is made in support of a Competing Service or Product in connection with or relating to its competition with the Company's services or products.

(c)     For purposes of clarity, nothing set forth in this <u>Section 13</u> shall prohibit in any way Executive's assertion of any rights or prosecution or defense of any claims arising out of or relating to this Agreement.

**14.     Notices.**  All notices required or permitted to be given hereunder shall be in writing and may be delivered by hand, by facsimile, by electronic exchange, or by nationally recognized private courier. Notices delivered by hand, by facsimile, by email, or by nationally recognized private carrier shall be deemed given on the day of receipt; <u>provided, however</u>, that a notice delivered by facsimile or electronic exchange shall only be effective if such notice is also delivered by hand, nationally recognized private courier or deposited in the United States mail, postage prepaid, registered or certified mail, on or before two business days following its delivery by facsimile.  All notices shall be addressed to the last known address of the party.

**15.     Section 409A.**

(a)     <u>Exemption of Payments; Compliance; 409A Penalties</u>.  All payments made under this Agreement are intended to be exempt from Section 409A of the Internal Revenue Code of 1986, as amended (the "<u>Code</u>") to the maximum extent possible, under either the separation pay exemption pursuant to Treasury regulation §1.409A-1(b)(9)(iii) or as short-term deferrals pursuant to Treasury regulation §1.409A-1(b)(4).  To the extent any payment under the Agreement is subject to Section 409A of the Code, this Agreement is intended to comply with the requirements of Section 409A of the Code and shall be interpreted and construed consistently with such intent.  In the event the terms of this Agreement would subject Executive to taxes or penalties under Section 409A of the Code ("<u>409A Penalties</u>"), the Company and Executive shall cooperate diligently to amend the terms of the Agreement to avoid such 409A Penalties, to the extent possible; provided that in no event shall the Company be responsible for any 409A Penalties that arise in connection with any amounts payable under this Agreement.

(b)     <u>Separately Identified Amounts</u>.  Each payment and benefit hereunder shall constitute a "separately identified" amount within the meaning of Treasury regulation §1.409A-2(b)(2).

(c)     <u>Separation from Service</u>.  Solely for purposes of determining the timing of any compensatory payments to Executive that are measured by reference to such Executive's termination of employment, such termination of employment shall be deemed to occur on the date of Executive's "separation from service" within the meaning of Section 409A of the Code, and for this purpose all references to "termination," "termination of employment," or like terms shall mean "separation from service."  To the extent this Agreement provides for payments to be made over a specified period of time following Executive's termination of employment and does not otherwise specify the timing of such payments, such payments shall be made in substantially equal installments over such period in accordance with the Company's general payroll practices, commencing on the date of Executive's separation from service.

(d)     Timing of Release.  Any payment that is deferred compensation subject to Section 409A of the Code which is conditioned upon Executive's execution of a Release and which is to be paid during a designated period that begins in one taxable year and ends in a second taxable year shall be paid in the second taxable year.

(e)     Specified Employees.  Notwithstanding any other provision in this Agreement, if Executive is a "specified employee," as defined in Section 409A of the Code, as of the date of termination, then to the extent any amount payable under this Agreement: (i) constitutes the payment of nonqualified deferred compensation, within the meaning of Section 409A of the Code; (ii) is payable upon Executive's separation from service, within the meaning of Section 409A of the Code; and (iii) would be payable prior to the six month "anniversary" of Executive's separation from service, payment of such amount shall be delayed until the earlier to occur of (a) the six month anniversary of the date of such separation from service, or (b) the date of Executive's death.

(f)     Reimbursement of Expenses or In-Kind Benefits.  Reimbursements of expenses and in-kind benefits shall be treated as follows:  (i) the amount of such expenses eligible for reimbursement or in-kind benefits provided in any taxable year shall not affect the expenses eligible for reimbursement or in-kind benefits provided in any other taxable year, except as otherwise allowed by Section 409A of the Code; (ii) any reimbursement shall be made on or before the last day of the calendar year following the calendar year in which the expenses to be reimbursed were incurred; and (iii) no right to reimbursement or in-kind benefits may be liquidated or exchanged for another benefit.

**16.     Non-Interference.**  Notwithstanding anything in this Agreement to the contrary, nothing in this Agreement prohibits Executive from confidentially or otherwise communicating or filing a charge or complaint with a governmental or regulatory entity, participating in a governmental or regulatory entity investigation, or giving truthful testimony or statements to a governmental or regulatory entity, or from responding if properly subpoenaed or otherwise required to do so under applicable law.

**17.     General Provisions.**

(a)     Applicable Law.  This Agreement shall be governed by the internal laws of the State of Michigan, without giving effect to any choice of laws rules that would require the application of the laws of any other jurisdiction.

(b)     Scope of Covenants.  Executive acknowledges that the territorial, time and activity limitations set forth in Sections 10, 11 and 13 (or the lack thereof, as the case may be) are reasonable and are properly required for the protection of the Company.  If any such territorial, time or activity limitation (or the lack thereof) is determined to be unreasonable by a court or other tribunal, the parties agree to the reduction of such territorial, time or activity limitations (including the imposition of such a limitation if it is missing) to such an area, period or scope of activity as said court or tribunal shall deem reasonable under the circumstances.  Also, if the Company seeks partial enforcement of Sections 10, 11 or 13 as to only a territory, time and scope of activity which is reasonable, then the Company shall be entitled to such reasonable partial enforcement.  If such reduction or (if the Company seeks partial enforcement) such partial enforcement is not possible, then the unenforceable provision or portion thereof shall be severed as provided in Section 17(c).

(c)     Severability.  Subject to Section 17(b), if any provision of this Agreement or portion thereof is determined by a court or other tribunal to be wholly or partially unenforceable in any jurisdiction, then (for purposes of such jurisdiction) such provision or portion thereof shall be struck from the remainder of this Agreement, which shall remain in full force and effect.  Without limitation of the foregoing: (i) any one or more of clauses (a) through (e) of Section 10 may be so severed from the remainder

of this Agreement; (ii) any one or more of <u>Sections 10</u>, <u>11</u>, or <u>13</u> may be so severed from the remainder of this Agreement; (iii) the Territory shall be construed as if each state therein and each county within each such state were listed in a separate clause which may be so severed; and (iv) the Restricted Period shall be construed as if each month therein were listed in a separate clause which may be so severed.

(d)　<u>Remedies</u>.　The remedies of each party hereunder shall be cumulative and concurrent, and may be pursued singularly, successively, or together, in such party's sole discretion. Executive agrees that any violation by Executive of <u>Sections 10, 11, 12 or 13</u> would cause irreparable harm to the Company.　Without limitation of the generality of the foregoing, if Executive violates any provision of <u>Sections 10, 11, 12 or 13</u>, then the Company shall be entitled, in addition to any other remedies that it may have, to specific, injunctive or other equitable relief (without the requirement of posting of a bond or other security) in order to enforce such provision.

(e)　<u>Mandatory Mediation and **Waiver of Jury Trial**</u>.　Other than disputes involving the covenants and obligations set forth in <u>Sections 10</u>, <u>11</u>, <u>12</u> or <u>13</u> which may be filed directly in a court of law, Executive and the Company agree that all other disputes and claims of any nature arising out of or relating to this Agreement, including with respect to Executive's employment by the Company or the termination of such employment by the Company or Executive (whether such disputes and claims are based in statutory, contractual, or common law and including all employment discrimination disputes and claims), will be submitted exclusively first to mandatory mediation in metropolitan Detroit, Michigan or at another mutually agreed-upon location, under the rules of Judicial Arbitration and Mediation Services ("<u>JAMS</u>") or under such other rules or under the auspices of such other organization as the parties may mutually agree. All information regarding the dispute or claim or mediation proceeding, including any mediation settlement, shall not be disclosed by Executive, the Company, or any mediator to any third party without the written consent of the Company (with the Board's approval) and Executive.　Costs of the mediator and mediation organization shall be split equal between the Company and Executive.　In the event that mediation does not resolve any dispute and Executive or the Company proceeds to file a complaint in court, Ex**ecutive and the Company hereby waive any right to a jury trial of that dispute.**

(f)　<u>Complete Agreement; Amendments</u>. This Agreement (and, if applicable, any other written agreement(s) of even date herewith between the parties concerning Executive's employment) (i) contains the complete agreement of the parties regarding the subject matter hereof; and (ii) supersedes any prior agreements, representations or warranties between the parties regarding Executive's employment.　No amendment hereto shall be enforceable unless in writing and signed and delivered by both Executive and the Company.

(g)　<u>Counterparts; Facsimiles</u>.　This Agreement may be executed by counterpart signature, each of which signature shall be deemed an original, all of which together shall constitute one in the same instrument.　Furthermore, delivery of a copy of such signature by facsimile transmission or other electronic exchange methodology shall constitute a valid and binding execution and delivery of this Agreement by such party, and such electronic copy shall constitute an enforceable original document.

(h)　<u>Successors; Third Parties</u>.　This Agreement shall be for the benefit of and binding upon: (i) Executive's heirs, legatees and personal representatives; and (ii) the Company's successors and assigns (it being understood that this Agreement is not assignable by Executive).

(i)　<u>Waivers</u>.　Any party's waiver of a breach by the other party of any provision of this Agreement or failure to enforce any such provision with respect to the other party shall not operate or be construed as a waiver of any subsequent breach by the other party of any such provision or of any other provision, or of that party's right to enforce any such provision or any other provision with respect to the other party.　No act or omission of the Company shall constitute a waiver of any of its rights hereunder

except for a written waiver signed by the Company which has been specifically approved by the Board. No act or omission of Executive shall constitute a waiver of any of Executive's rights hereunder except for a written waiver signed by Executive.

(j)     Construction. The headings contained in this Agreement are for convenience of reference only and shall not affect the meaning or interpretation of this Agreement. Unless this Agreement expressly provides otherwise, each definition herein applies (i) for purposes of this entire Agreement; and (ii) to both the singular and plural forms (and other grammatical variations) of the defined term. Unless the context clearly indicates otherwise, each pronoun herein shall be deemed to include the masculine, feminine, neuter, singular and plural forms thereof. The terms "including", "includes", "include" and words of like import shall be construed broadly as if followed by the words "without limitation", whether or not such words or similar words are stated. Unless otherwise explicitly stated, all section references are to the references to sections of this Agreement. This Agreement shall not be construed strictly against the drafter (and any rule of construction to that effect shall not be applied).

(k)     Other Obligations. Without implication that the contrary would otherwise be true, Executive's and the Company's (if any) obligations under Sections 10, 11, 12 and 13 are in addition to, and not in limitation of, any obligations that Executive or the Company (as the case may be) may have under: (i) applicable law (including any law regarding trade secrets, duty of loyalty, fiduciary duty, unfair competition, unjust enrichment, conversion, misappropriation or fraud); or (ii) any other written agreement to which Executive or the Company is a party (including any non-compete, confidentiality, trademark, inventions or non-disparagement provisions or other restrictive covenants therein).

(l)     No Prior Restrictions. Executive hereby represents and warrants to the Company that Executive is free to enter into employment with the Company and that there are no contracts or restrictive covenants preventing full performance of Executive's duties.

[Signatures on next page]

The parties executed and delivered this Employment Agreement as of the Effective Date.

**Executive**:

_____
**Eric Graczyk**

**Company:**

**Offshore Acquisition, LLC**

By: _____

Name: _____

Title: _____